**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MALLET AND COMPANY INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 19-1409 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| ADA LACAYO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER**

Having conducted a Hearing on Plaintiff's Amended Motion for Preliminary Injunction (Doc. 91), the Court makes the following Findings and Conclusions.  To the extent that Defendants have objected to the Court's consideration of Plaintiff's affidavits, based on hearsay or lack of personal knowledge, those objections have been, and remain, OVERRULED, for the reasons stated at the Hearing.  *See* Tr. (Doc. 104) at 42-44.

**FINDINGS OF FACT**

1.      At all times relevant to this litigation, Mallet and Company, Inc. ("Mallet" or "Plaintiff"), wholly owned by Vantage Specialties, Inc., has been in the business of developing, manufacturing and selling stabilizers, baking release agents, glazes, filling formulations and equipment used to apply baking release agents.  Tr. at 34, 48-49.

2.      Release agents are applied to pans at industrial bakeries, to ensure the release of baked goods from a pan consistently over hundreds of uses without loss of efficacy normally seen as pan surfaces degrade over time.  Plaintiff's Hrn'g Ex. 14, Porzio Decl. ¶ 8; Plaintiff's Ex. 72, Porzio Dep. 92:20-93:1.

3.      Mallet's evidence establishes that the formulation of its relevant products takes substantial time, sometime years.  *See, e.g.*, Tr. at 38; *see also* evidence cited in Pl.'s proposed Fs & Cs (Doc. 107) at ¶¶ 8-9.

4.      Defendant Ada Lacayo's testimony, to the effect that formulating such products is "very easy," *see, e.g.*, Tr. at 78, was not credible.

5.      Defendants' evidence, and elicitation of testimony, regarding a limited number of "straight" or unformulated oils sold by Mallet and Bundy/Synova are a red herring. As factfinder, the Court determines that this point is immaterial to Mallet's entitlement to relief.

6.      The Court accepts Mallet's evidence that it took reasonable measures to prevent disclosure of its confidential, proprietary and trade secret information.  *See* evidence cited in Pl.'s Fs & Cs at ¶¶ 15-29, 31-39, 42-43; *see also* Tr. at 53 (testimony of R. Ergun, indicating that she only shared Mallet's formulations on two occasions, to customers subject to confidentiality agreements).

7.      As factfinder, the Court rejects Defendants' evidence and testimony that publicly-available product information was or is sufficient to recreate Mallet's formulations. *Cf.* Tr. at 77-78.

8.      Mallet has established that, through the course of her employment, Lacayo had access to, and was intimately familiar with, Mallet's protectable information; and the Court adopts the contents, and record citations, in Plaintiff's Proposed Findings at ¶¶ 44-60.

9.      The same is true of Defendant William "Chick" Bowers, and the Court adopts the contents, and record citations, in Plaintiff's Proposed Findings at ¶¶ 62-71.

10.     Both Lacayo and Bowers were subject to confidentiality agreements; and Lacayo was subject to a three-year covenant not-to-compete.  Although the signed agreements speak for

2

themselves, the Court adopts the contents, and record citations, in Plaintiff's Proposed Findings at ¶¶ 72-86, as a summary − and to the extent that they are not-inconsistent with the contents of the signed writings.

11.     In June 2017, Bundy/Synova solicited confidential information regarding Plaintiff's product formulations from former Mallet employee, Shane Zhou.  Defendant-witness Russel T. Bundy was not credible in attempting to characterize his email to Mr. Zhou (Pl.'s Hrn'g Ex. 2) as only seeking clarification whether the referenced-products were "bread pan oils" versus "cake greases."  *See* Tr. at 68-72.

12.     The Court adopts the contents, and record citations, in Plaintiff's Proposed Findings at ¶¶ 95-99, regarding Mr. Bundy's *scienter* in seeking Mallet's confidential business information.[1]

13.     The Court adopts the contents, and record citations, in Plaintiff's Proposed Findings at ¶¶ 100-113, regarding Lacayo's entering employment with Bundy/Synova, and her efforts to secure and retain Mallet's protected written information.[2]

14.     Lacayo's explanations that she acquired Mallet's materials over a course of years, and due to Mallet's purported computer-system deficiencies − and/or that she retained the materials so that she could help Mallet employees after her term of employment – are not credible.

---

[1] Defendants' relevancy objection to Plaintiff's Hearing Exhibit 24 is OVERRULED.  *See* Pl.'s Fs & Cs at 17 n.9.

[2] Defendants' objection to Plaintiff's Exhibit 33 is moot, because the Court has relied on the underlying documentation, to which there has been no objection.  *See* Pl.'s Fs & Cs at 19 n.10. Defendants' objections to Plaintiff's Exhibit 31, based on relevancy and foundation, are OVERRULED.  *See id.* at 19 n.11.

15.     Particularly, Defendants offer no credible explanation for why Lacayo printed, and transferred to personal USB devices, documents regarding Mallet's product formulations shortly before leaving its employ.

16.      The Court finds credible Mallet's evidence regarding Lacayo's efforts to conceal the fact of her employment with Bundy/Synova, and her continued retention of protected materials.

17.     The Court finds credible, and persuasive, Mallet's evidence that Mr. Bundy either knew or was willfully ignorant of the circumstances surrounding Lacayo's retention of protected materials.  The Court adopts the contents, and record citations, in Plaintiff's Proposed Findings at ¶¶ 114-141.

18.     Defendants' concealment, and/or lack of investigation, regarding Lacayo's and Bowers's retention of protected materials excuses any purported delay in Mallet's legal enforcement; and, in any event, Mallet acted with reasonable diligence.

19.     Bowers's usurpation of Mallet's protected information, including efforts made while still in Mallet's employ and after the commencement of litigation, are even more apparent.

20.     Defendants have offered little in the way of explanation, let alone credible one(s), for Bowers's efforts in transmitting protected information for use with Bundy/Synova, and his efforts to conceal his conduct.  In these regards, the Court adopts the contents, and record citations, in Plaintiff's Proposed Findings at ¶¶ 142-175.[3]

---

[3] Defendants' objection to Plaintiff's Exhibit 36 is moot, because the Court has relied on the underlying documentation, to which there has been no objection.  *See* Pl.'s Fs & Cs at 25 n.12. Defendants' objection to Exhibits 30, 39 and 40, based on relevancy, lack of foundation and/or hearsay, are OVERRULED.  *Id.* at 26 n.13 *and* 28 n.14.

21.     The Court finds – by a preponderance of the evidence and vis a vis Mallet's likelihood of success on the merits – that Bundy/Synova, through the efforts of Lacayo, Bowers and Bundy, enjoyed an unlawful competitive advantage in bringing to market its release agents.

22.     Mallet also has satisfied the Court that, if injunctive relief is not granted, Bundy/Synova will continue to have access to its protected materials, and will continue to utilize them.  In these regards, the Court adopts the contents, and record citations, in Plaintiff's Proposed Findings at ¶¶ 177-256.[4]

23.     The Court has considered the testimony of Defendants Bundy, Lacayo and Bowers regarding the personal and financial hardships they may endure should injunctive relief be granted.  Defendants' testimony was – in this regard – credible, and the Court is not entirely lacking in sympathy.

24.     These considerations, however, do not undermine Mallet's entitlement to redress, for what the Court believes to be fairly clear violations of the legal standards recited in the Conclusions of Law, below.

25.     The Court also notes that the putative hardships discussed by Lacayo – relating to her potential inability to work with Bundy/Synova – makes her no worse off than had she respected her covenant not to compete.

---

[4] Defendants' objections to Plaintiff's Exhibits 36, 43-44, 52, 63-65 and 76 are OVERRULED, for the same reasons previously referenced herein.  *See* Pl.'s Fs & Cs at 33 n.15; at 38 ns.16-18; and at 39 n.19.  In sum, and to the extent that the objections are not mooted through consideration of underlying documentation, the Court is unpersuaded by all of Defendants' arguments regarding hearsay, lack of personal knowledge, relevancy and lack of foundation.

## CONCLUSIONS OF LAW

1.      Under Fed. R. Civ. P. 65, a plaintiff moving for a preliminary injunction must show:  "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted."  Reilly v. City of Harrisburg, 858 F.3d 173, 176 (3d Cir. 2017).

2.      "If these two 'threshold' factors are met, a court then considers the remaining two factors ‒ '(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest' ‒ and determines, on balance of all four factors, whether to grant the requested preliminary relief."  Id.

3.      In demonstrating the likelihood of success on the merits, a plaintiff need not show that it is more likely than not that it will succeed.  Singer Mgmt. Consultants, Inc. v. Milgram, 650 F.3d 223, 229 (3d Cir. 2011).  Instead, a plaintiff must only demonstrate "a reasonable probability of success on the merits."  Am. Express Travel Related Svcs. v. Sidamon-Eristoff, 669 F.3d 359, 366 (3d Cir. 2012).

4.      In other words, a "plaintiff need only prove a *prima facie* case, not a certainty that [it] will win."  Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001).

A.      **Count I-Breach of Contract, against Lacayo and Bowers**

5.      To prove a breach of contract, a plaintiff must show:  (1) the existence of a valid contract; (2) the breach of a duty imposed by the contract; and (3) resulting damages. Omicron Sys. v. Weiner, 860 A.2d 554, 564 (Pa. Super. 2004).

6.      A restrictive covenant is valid under Pennsylvania law if it is ancillary to an employment relationship, supported by adequate consideration, reasonably limited in time and geographic scope and reasonably designed to safeguard a legitimate interest of a former

employer.  Our Town v. Rousseau, 2017 WL 34698, *6 (M.D. Pa. Jan. 3, 2017) (citation to quoted source omitted).

7.      Lacayo's and Bowers's covenants were ancillary to the employment relationship with Mallet, supported by adequate consideration and reasonably limited in time and scope for employees of their high-level positions.  See, e.g., John G. Bryant Co. v. Sling Testing & Repair, Inc., 369 A.2d 1164, 1168 (Pa. 1977).  The covenants also provided that Lacayo and Bowers could not share Mallet's confidential information with competitors during or after their employment.

8.      Lacayo's three-year restrictive covenant was reasonably tailored to protect trade secrets given her work with Mallet's formulas, its most secret information.  See, e.g., John G. Bryant Co. at 1170 (finding three-year restriction within permissible bounds).

9.      Geographic scope is non-dispositive, as Lacayo is working for a direct competitor just across state lines, formulating competing products and interacting with the same nationwide customers she interacted with while at Mallet.[5]

10.     Lacayo and Bowers breached their contractual duties by disclosing and misusing Mallet's confidential and trade secret information and engaging in other violative acts, both before and after ceasing employment with Mallet.

---

[5] Even assuming the covenant's geographic limitation is/was overbroad, it is within the Court's authority to modify the scope of the restriction to make it reasonable.  See generally Tilden Recreational Vehicles, Inc. v. Belair, 786 Fed. Appx. 335, 341-42 (3d Cir. Sept. 5, 2019) (applying Pennsylvania law).  Given that Mallet and Bundy/Synova are in the neighboring states of Pennsylvania and Ohio, the Court does not believe that enforcement of the covenant (as "blue penciled," if need be) is unreasonable.  Finally-adjudicating the precise scope of the covenant, presently, would not prove a good use of the Court's time; and, there are multiple, independent legal theories warranting a grant of injunctive relief.  See discussions in text, infra.

11.     Lacayo and Bowers are working for Bundy/Synova in substantially the same roles that they held when working for Mallet.

12.     Lacayo's and Bowers's unlawful actions have caused irreparable harm to Mallet's business.  Their actions have allowed Bundy/Synova to significantly expedite their entry into the release agent business.

13.     Mallet has established a reasonable likelihood of success on its contract claim(s).

**B.     Counts II & VII-Breach of Fiduciary Duty, against Lacayo and Bowers; and Aiding and Abetting, against Bundy/Synova**

14.     Pennsylvania employees may not act for a person or entity whose interests conflict with their employer.  Synthes, Inc. v. Emerge Med., Inc., 25 F. Supp. 3d 617, 667 (E.D. Pa. 2014) (citing Pennsylvania law).  Mallet's interests conflict with those of Bundy/Synova.

15.     To establish breach of fiduciary duty, a plaintiff must prove that: (1) the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he was employed; (2) the plaintiff suffered injury; and (3) the agent's failure to act solely for the plaintiff's benefit was a real factor in bringing about the plaintiff's injuries.  Id.

16.     An employee's duty of loyalty to his or her employer is inherent to the employer-employee relationship and cannot be rejected.  Colgate Palmolive Co. v. Tandem Indus., 485 Fed. App'x 516, 518 (3d Cir. Jun. 5, 2012).  The duty is independent, and does not require the existence, of a restrictive covenant.  Synthes, Inc., 25 F. Supp. 3d at 667.

17.     "[W]here an employee, bound by a restrictive covenant, makes preparations to compete with his current employer, the employee could be said to have breached his duty of

loyalty by seeking employment with admitted competitors of the employer while still employed." *Id.* at 667-68.

18.     Bowers and Lacayo owed duties to Mallet, both through their contractual agreements and the larger social expectation of current and former employees. *See generally* Teva Pharms. USA, Inc. v. Sandhu, 291 F. Supp. 3d 659, 674-75 (E.D. Pa. 2018).[6]

19.     Despite these obligations, Lacayo has been shown to have amassed thousands of pages of Mallet's confidential and trade secret information, including Mallet's product formulas, and did not disclose this to Mallet, nor did she delete it after her employment, despite indicating that she would do so.  She also admits that she may have shared formulas with a Synova employee.

20.     Lacayo has accessed this information from a Bundy/Synova computer through shared drives, email and USB devices while performing her job duties for Bundy/Synova.

21.     Bowers also spent the last period of his employment with Mallet sharing its confidential and trade secret information with Bundy/Synova to expedite the launch of its competing business.

22.     Bowers did so knowing that Bundy would launch a competitive release agent business, and he did not share this information with Mallet.

23.     Bowers's and Lacayo's conduct and omissions violated their duties to Mallet. *See* discussions *supra*; *see also* Orthovita, Inc. v. Erbe, 2008 WL 423446, *7 (E.D. Pa. Feb. 14, 2008) (employee may breach fiduciary duty to employer through act or omission).

24.     "Although an employee has a right to make preparations to go into a competing

---

[6] Given Plaintiff's ability to plead in the alternative, Defendants' arguments under the gist of the action test − and regarding preemption − are premature at this stage in the proceedings.

business even while he is still employed, he may not breach the undivided duty of loyalty he

owes his employer while still employed, by soliciting his employer's customers or other acts of

secret competition." <u>Stream Cos., Inc. v. Windward Advertising</u>, 2013 WL 12114590, *17 (E.D.

Pa. Feb. 8, 2013) (applying Pennsylvania law, citation to quoted source omitted).

  25. Mallet has established a reasonable likelihood of success on its breach of

fiduciary duty claims.

  26. To state a claim for aiding and abetting a breach of fiduciary duty, the plaintiff

must show:  (1) a third party breached a fiduciary duty owed to the plaintiff; (2) the aider and

abettor knew of the breach; and (3) the aider and abettor substantially assisted or encouraged the

other in effecting that breach.  <u>Teva Pharms. USA, Inc.</u>, 291 F. Supp. 3d at 677.

  27. For the reasons stated above and below, and based on Mr. Bundy's conduct and

*scienter*, Mallet has established a reasonable likelihood of success on the aiding and abetting

claim(s).

## C. Count III-Tortious Interference with Contractual Relations, against Bundy/Synova

  28. To prevail on a tortious interference claim, a plaintiff must prove:

(1) the existence of a contractual relationship between the plaintiff and a third party; (2) an intent

on the part of the defendant to harm the plaintiff by interfering with that contractual relationship;

(3) the absence of privilege or justification on the part of the defendant; and (4) damages suffered

as a result of the defendant's conduct.  <u>Empire Trucking Co. v. Reading Anthracite Coal Co.</u>,

71 A.3d 923, 932-33 (Pa. Super. 2013).

  29. Under this standard, a defendant, even if it seeks to further a legitimate business

interest such as ordinary competition, will be liable if it fails to follow "the rules of the game

which society has adopted." *Id.* at 934 (internal quotations omitted).

30.     "An employment contract . . . may be only partially terminable at will. Thus, it may leave the employment at the employee's option but provide that he is under a continuing obligation not to engage in competition with his former employer.  Under these circumstances[,] a defendant engaged in the same business might induce the employee to quit his job, but he would not be justified in engaging the employee to work for him in an activity that would mean violat[ing] the contract not to compete."  DePuy Synthes Sales, Inc. v. Globus Med., Inc., 259 F. Supp. 3d 225, 245 (E.D. Pa. 2017) (quoting Rest. (Second) Torts § 768, cmt. i).

31.     Consistent with the Court's, as-factfinder's, conclusion regarding Mr. Bundy's *scienter*, Bundy/Synova knew or should have known that Lacayo and Bowers were, or would be, acting in violation of contractual obligations owed to Mallet.

32.     Bundy/Synova's actions fall outside acceptable competition because Mr. Bundy, in essence, solicited current and former Mallet employees to breach their contractual (and other) duties to Mallet.  *See* Liberty Mut. Ins. Co. v. Gemma, 301 Supp. 3d 523, 544 (W.D. Pa. 2018) (concerted effort to misappropriate the plaintiff's confidential customer information fell outside the "rules of the game").

33.     Lacayo and Bowers facilitated Bundy/Synova's efforts to seize Mallet's customers and market position, especially given that Bundy/Synova has made sales to Mallet customers.

34.     Mallet has established a reasonable likelihood of success on its tortious-interference claim(s).

**D.    Counts IV and V-Federal Defend Trade Secrets Act and Actual or Threatened Misappropriation of Trade Secrets and Confidential Information in Violation of the Pennsylvania Uniform Trade Secrets Act, against all Defendants**

35.    The Defend Trade Secrets Act (DTSA) essentially protects the same type of information as the Pennsylvania Uniform Trade Secrets Act (PUTSA).  Teva Pharms. USA, Inc., 291 F. Supp. 3d at 674-75.  Under Pennsylvania law, an employer has a legitimate interest in the protection of its trade secrets and other confidential information.  *See generally* Hess v. Gebhard & Co., 808 A.2d 912, 921 (Pa. 2002) (explaining that employers have protectable interests in "trade secrets [and] confidential information").

36.    The four showings required under PUTSA are:  (1) the existence of a trade secret; (2) the communication of the trade secret pursuant to a confidential relationship; (3) the use or threatened use of the trade secret in violation of that confidence; and (4) harm.  Kenset Corp. v. Ilanjian, 600 Fed. App'x 827, 831 (3d Cir. Jan. 28, 2015) (per curiam) (citing 12 Pa. Cons. Stat. § 5303(a)).

**1.        Defendants have Mallet's trade secrets.**

37.    PUTSA defines "trade secrets" as "information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that (1) derives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use;" and "(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  12 Pa. Cons. Stat. § 5302.

38.    Pennsylvania courts look to the following factors to determine whether information is a trade secret:  (1) the extent to which information is known outside of plaintiff's business; (2) the extent to which the information is known by employees and others involved in

plaintiff's business; (3) measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the plaintiff spent developing the information; and (6) the difficulty with which the information could be legitimately acquired or reproduced by others.  Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 109 (3d Cir. 2010).

39.     Customer information obtained by an employee that is not readily available or has been generated through expense, time and effort may qualify as a trade secret.  A.M. Skier Agency, Inc. v. Gold, 747 A.2d 936, 940 (Pa. Super. 2000); see Corp. v. Martucci, 136 A.2d 838 (Pa. 1957).

40.     At least some of the Mallet information in question, possessed by Defendants, satisfies the trade secret definition(s). The information includes, among other things, highly sensitive details about how Mallet produces, markets and sells its release agents, which Mallet protects through its policies and employee confidentiality and non-compete agreements. It is harmful to Mallet if internal documents discussing its products are in the hands of competitors, because even Mallet's long-term customers do not know the specific product ingredients, source of supply or pricing details of its products, even after working with them for decades.  Mallet's internal documents were the result of a substantial investment of time, money and resources, making them invaluable assets to the company.  Mallet's information could not be acquired by people outside of Mallet, except through improper means (or pursuant to a confidentiality agreement).

41.     More specifically, the protected materials include:  Mallet's formulas; customer purchase orders demonstrating Mallet's pricing; identification of customers experiencing difficulty with Mallet's products; internal discussions of "actual major problems" at customer

locations; internal discussions of how Mallet would address issues with its products; internal discussions of customers' preferences and complaints; Mallet's completed organic certifications; identification of Mallet's supply source for product ingredients; Mallet's internal manuals and procedures showing how Mallet's lab is operated; pricing and volume data; information about Mallet's equipment; Mallet's training materials showing how Mallet markets and sells its products; and a compilation of Mallet's product specification sheets.

42.    Defendants have not convinced the Court that such materials are otherwise available; that Mallet has not made reasonable efforts to maintain their confidentiality; or that Defendants have any legitimate interest in possessing such materials.

### 2.        Mallet takes reasonable efforts to protects its trade secrets.

43.    As found above, Mallet has undertaken reasonable efforts to protect its confidential information.  Mallet need not undertake every available option to have acted reasonably.  *See* Vendavo, Inc. v. Long, 397 F. Supp. 3d 1115, 1136-37 (N.D. Ill. 2019) ("[A] company need not monitor its employees like a police state to garner trade secret protection for its confidential information."); *see also* cases string-cited in Pl.'s Fs & Cs at pg. 52, ¶ 56.

44.    Even absent confidentiality agreements, Pennsylvania courts should enjoin employees from using trade secret information, obtained through the employment relationship, to compete with their employers.  *See* BIEC Int'l, Inc. v. Global Steel Services, Ltd., 791 F. Supp. 489, 548 (E.D. Pa. 1992) ("Pennsylvania law makes clear . . . that a court must enjoin an employee from competing with his ex-employer to the extent necessary to protect the ex-employer's trade secrets, even if the employee is free to compete, *i.e.* is not bound by a covenant not-to-compete.").

14

45.     The efforts Mallet takes to protect its information are sufficient to afford its

information trade secret protection.  An employer's ability to take additional measures to protect

against the theft of its information does not render its information unprotectable.

### 3.          Defendants have misappropriated Mallet's trade secrets.

46.     There are two types of misappropriation under PUTSA:

> First, misappropriation includes the "acquisition of a trade secret of another by
> a person who knows or has reason to know that the trade secret was acquired
> by improper means."  12 Pa. Cons. Stat. §5302.  Misappropriation also
> includes "disclosure or use of a trade secret of another without express or
> implied consent by a person who . . . used improper means to acquire
> knowledge of the trade secret."  *Id*.  And PUTSA further defines improper
> means as including, "but . . . not limited to, theft, bribery, misrepresentation,
> breach or inducement of a breach of a duty to maintain secrecy or espionage
> through electronic or other means."

PPG Indus. v. Jiangsu Tie Mao Glass Co., 2020 WL 1526940 55687, *15 (W.D. Pa. Mar. 31,

2020).

47.     Courts in this jurisdiction have long recognized that "[m]isappropriation and

misuse of trade secrets can rarely be proved by convincing direct evidence."  Greenberg v.

Crovon Plastics Co., Inc., 378 F. Supp. 806, 814 (E. D. Pa. 1974); *accord* Bro-Tech Corp. v.

Thermax, Inc., 651 F. Supp. 2d 378, 412, n.240 (E.D. Pa. 2009).  "Instead, plaintiffs may

establish use or disclosure through inference, by showing that the defendant had access to

plaintiff's trade secret, and that there are 'substantial similarities' between defendant's product

and plaintiff's secret information."  Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378, 412

n.240 (E.D. Pa. 2009) (citing Scanvec Amiable, Ltd. v. Chang, 80 Fed. App'x 171, 179 (3d Cir.

Oct. 15, 2003)).  Here, Defendants have described their products as "Synova = Mallet" and said

they could make exact matches of Mallet products.

48.     Federal and state courts agree that, in trade secret cases, an employer may be held vicariously liable for the misappropriation of its employees. *See* Advanced Fluid Sys. v. Huber, 295 F. Supp. 3d 467, 486 (M.D. Pa. 2018).

49.     Under Pennsylvania law, an employer may be vicariously liable for its employee's intentional acts if the conduct:  (1) is similar in kind to that which the employee is hired to perform, (2) occurs "substantially within" the temporal and spatial scope of employment, and (3) is "actuated," at least in part, in service of the employer.  *See* PNC Mortg. v. Superior Mortg. Corp., 2012 WL 628000, *30 (E.D. Pa. Feb. 27, 2012) (citing Bro-Tech, 651 F. Supp. 2d at 419-20).

50.     Bundy/Synova is liable for the misappropriation of information by Bowers and Lacayo because they were hired to develop formulas and sell those products, they used Mallet's information at the same time as performing these tasks and did so with Mr. Bundy's knowledge or willful ignorance.

51.     Before offering Lacayo employment, Bundy/Synova tried to partner with Mr. Zhou, asking him for assistance designing its production facility.  While Lacayo was still employed at Mallet, Bundy/Synova sought her expertise in connection with its facility plans. Courts have found that the use of protected information in designing a facility to make products identified in trade secret materials constituted misappropriation of trade secrets.  PPG Indus., 2020 WL 1526940 at *14-15.

52.     The timing of Bowers's and Lacayo's sending Mallet information to themselves − around the time they agreed to work for Bundy/Synova − supports a finding that such actions were purposeful and a misappropriation of Mallet's trade secrets.  *See. e.g.*, L.B. Foster Company v. Barnhart, 2014 WL 11395182, *3 (W.D. Pa. Jul. 30, 2014) ("Quite suspiciously,

the creation and ultimate cloud storage of this information was done subsequent to Defendant's

decision to accept [his new company's] offer of employment.  The commingling of personal

documents with the proprietary information does not change this result.").

53.     Mr. Bundy knew or had reason to know Zhou, Bowers and Lacayo were required

to keep Mallet's information confidential because Zhou had expressed concern that his

"partnership" with Bundy/Synova violated his non-compete with Mallet; and Bundy received a

copy of the cease-and-desist letter sent by Mallet in March 2018.  Despite this knowledge,

Mr. Bundy allowed Lacayo to formulate Synova's products and accepted Mallet's information

knowing it was misappropriated.

54.     Bowers provided Mr. Bundy with a stream of perceived "major" issues at Mallet.

That the information was taken in breach of Bowers's and Lacayo's duty to maintain secrecy

was apparent to Bundy/Synova given that Bowers noted that he was sending information from

his personal email.

55.     Mr. Bundy even asked for Mallet's formulas and help starting Synova.

A defendant's request for information from an employee who the company knows is subject to a

confidentiality agreement constitutes misappropriation under PUTSA.  PPG Indus., 2020 WL

1526940 at *15-16.

56.     Bundy/Synova have acquired a substantial volume of Mallet's confidential and

trade secret information and done nothing to stop use of this data, even after litigation

commenced.

57.     In light of Bundy/Synova's lack of remedial action, an injunction will issue

because "there is sufficient likelihood, or substantial threat of a defendant [acting on] disclos[ed]

trade secrets."  See Stream Cos., 2013 WL 12114590 at *14; Den-Tal-Ez, Inc. v. Siemens

Capital Corp., 566 A.2d 1214, 1232 (Pa. Super. 1989) ("The proper inquiry is not whether defendant already has used or disclosed [trade secrets], but whether there is sufficient likelihood, or substantial threat, of defendant doing so in the future.").

58.     Actively concealing plans to form a competing company; using employee status to copy documents onto external storage drives; the existence of information taken close to or immediately following resignations on the new company's computers; and failure to return devices used during former employment are all factors showing the substantial threat of a defendant disclosing trade secrets.  Stream Cos., 2013 WL 12114590 at *15..

### 4.     Mallet acted reasonably and promptly to protect its trade secrets when it learned of Defendants' actions.

59.     Mallet acted reasonably and with sufficient promptness in protecting its trade secret information.  *See* discussions *supra*.  Defendants' purposeful concealment, moreover, excuses any "delay" in Mallet's bringing suit.  *See* Prison Health Servs. v. Umar, 2002 U.S. Dist. LEXIS 12288, *69-70 (E.D. Pa. Jul. 3, 2002) (rejecting defendants' timeliness arguments based on, among other things, their coming to court with unclean hands); Giddings v. State Board of Psychology, 669 A.2d 431 (Pa. Commw. Ct. 1995) (same).

### 5.     Courts have enjoined defendants to stop them from using confidential and trade secret information.

60.     Many courts have issued injunctions over the years where defendants' conduct was similar to Lacayo's, Bowers's and Bundy/Synova's, including to end the use of misappropriated information to start rival companies.  *See, e.g.*, Latuszewski v. VALIC Fin. Advisors, Inc., 2007 U.S. Dist. LEXIS 93329, *18 (W.D. Pa. Dec. 18, 2007) (granting injunctive relief where former employees used the plaintiff company's trade secrets to target its customers

at their new company).  Even just an "intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm." L.B. Foster, 2014 WL 11395182 at *3 (quoting Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 92-93 (3d Cir. 1992)).

61.     An injunction is appropriate to stop the use of trade secret materials obtained by a former employee through the course of his or her employment.  L.B. Foster, 2014 WL 11395182 at *3 (issuing a preliminary injunction order enjoining the defendant from "sharing confidential and proprietary information with [his new employer]").

62.     Courts grant preliminary injunctions where the use of protectable information would violate confidentiality agreements between the parties.  Home Line Furniture Indus. v. Banner Retail Mktg., LLC, 630 F. Supp. 2d 527 (E.D. Pa. 2009) (granting a preliminary injunction not only based on PUTSA, but also on the defendant's breaches of the confidentiality agreement between the parties).

63.     An injunction stopping the manufacture of a product is appropriate where the misappropriated trade secrets are "inextricably connected to the defendant's manufacture of the product, because the defendant cannot be relied upon to 'unlearn' or abandon the misappropriated technology."  Christopher M's Hand Poured Fudge, Inc. v. Hennon, 699 A.2d 1272, 1277 (Pa. Super. 1997) (some internal quotations, and citation to quoted source, omitted).

64.     Consistent with the foregoing, Mallet has demonstrated a reasonable likelihood of success on the merits, and a production injunction is warranted.

**E.     Counts VI-Inevitable Disclosure of Confidential Information and Trade Secrets, against all Defendants**

65.     In light of the Court of Appeals for the Third Circuit's ruling in Bimbo Bakeries, the Court does not believe that addressing the "inevitable disclosure doctrine" is necessary to its

conclusion that injunctive relief is warranted.  *See id.*, 613 F.3d at 110-11 (noting the imprecision

of the word, "inevitable," and recognizing the paradoxical tendency to conclude that

"Pennsylvania courts apply the inevitable disclosure doctrine to grant injunctions based not on a

trade secret's *inevitable* disclosure but on its *likely* disclosure") (emphasis in original).

66.      "[T]the proper inquiry in determining whether to grant an injunction to prevent

the threatened disclosure of trade secrets is not whether a defendant inevitably will disclose a

trade secret in the absence of injunctive relief, but instead whether there is sufficient likelihood,

or substantial threat, of defendant doing so in the future."  *Id.* at 115-16 (internal quotations and

citations to quoted sources omitted); *accord* <u>CentiMark Corp. v. Jacobsen</u>, 2011 WL 5977668,

\*12 (W.D. Pa. Nov. 29, 2011) (acknowledging, consistent with <u>Bimbo Bakeries</u>, that subsequent

state and federal precedent has revealed the "inevitability" inquiry to somewhat miss the mark).

67.      The Court already has held that there is sufficient likelihood, and/or substantial

threat, of continued disclosure/violation, and it declines to apply the inevitable disclosure

doctrine.


**F.      <u>Count VIII-Conversion, against all Defendants</u>**

68.      The Court finds it unnecessary to reach Plaintiff's conversion claims, for the

purposes of the preliminary injunction proceedings; and it states no opinion regarding the same.


**G.      <u>Count IX-Unfair Competition, against all Defendants</u>**

69.      Unfair competition under Pennsylvania law is (1) engaging in deceptive

marketing, infringement of trademark or other protectable intellectual property, misappropriating

trade secrets, or acts or practices that are actionable under federal or state statutes; (2) that causes

harm to the plaintiff's commercial relations.  Restatement (3d) of Unfair Competition § 1;

*see also* <u>Giordano v. Claudio</u>, 714 F. Supp. 2d 508, 521 & n.6 (E.D. Pa. 2010).

70.     "Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." <u>Schuylkill Valley Sports, Inc. v. Corporate Images Co.</u>, 2020 WL 3167636, *9 (E.D. Pa. Jun. 15, 2020) (citing <u>Synthes (USA) v. Globus Med., Inc.</u>, 2005 U.S. Dist. LEXIS 19962, *24-25 (E.D. Pa. Sept. 14, 2005)).

71.     To state a claim for unfair competition, a plaintiff need only show that "the defendant misappropriated trade secrets, tortiously interfered with contract, improperly induced its employees or unlawfully used its confidential information[.]" <u>Teva Pharms. USA, Inc.</u>, 291 F. Supp. 3d at 679.  Mallet satisfies this requirement.

72.     Mallet has made sufficient allegations of harm.  *See* discussions *supra* and *infra*.

73.     Mallet has demonstrated a reasonable likelihood of success on its unfair competition claim(s).

**H.     <u>Mallet will suffer irreparable harm without injunctive relief.</u>**

74.     Harm is irreparable "when it cannot be adequately compensated in damages, either because of the nature of the right that is injured, or because there exists no certain pecuniary standards for the measurement of damages." <u>Bimbo Bakeries USA, Inc. v. Botticella</u>, 2010 WL 571774, *15 (E.D. Pa. Feb. 9, 2010).

75.     Harms compensable by money damages (*e.g.*, lost sales from a defendant's actions) are not appropriate grounds for injunctive relief.  <u>Frank's GMC Truck Ctr., Inc. v. General Motors Corp.</u>, 847 F.2d 100, 102 (3d Cir. 1988).

76.     "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." Pappan Enterprs., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998).

77.     The "threat of unbridled continuation of the violation [of a restrictive covenant] and the resultant incalculable damage to the former employer's business establishes irreparable harm." Healthcare Servs. Group Inc. v. Fay, 597 Fed. App'x 102, 103-104 (3d Cir. Jan. 22, 2015) (quoting John G. Bryant Co., 369 A.2d 1164 at 1167). This is because the loss of assets like future business opportunities, client goodwill and an employer's reputation, along with the loss sustained by the misuse of confidential information, is particularly difficult to quantify − and perhaps even harder to undo. See, e.g., Masure v. Massa, 692 A.2d 1119, 1122 (Pa. Super. 1996) (plaintiff "suffered irreparable injury as the number of lost customers cannot be accurately calculated"); see also Revzip, LLC v. McDonnell, 2019 WL 6701835, *8 (W.D. Pa. Dec. 9, 2019) (breach of contract, tortious interference and trade secrets claims all are of the type for which irreparable harm may warrant injunctive relief).

78.     The use of trade secrets, in and of itself, may constitute irreparable harm. SI Handling Systems, Inc., 753 F.2d 1244, 1264 (3d Cir. 1985).

79.     A party's "intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm." Campbell Soup Co., 977 F.2d 86 at 92-93; Stream Cos., 2013 WL 12114590 at *18 ("Because [d]efendants took confidential, as well as trade secreted, information for use in their new agency and because they have displayed an intention to make imminent and continued use of this information, [plaintiff] has demonstrated that they will suffer irreparable harm absent an injunction.").

80.     The use of protected information by a competitor is "precisely the genre of the case and the type of injury that most warrants injunctive relief." Den-Tal-Ez, 566 A.2d at 1233 (citing Ecolaire, Inc. v. Crissman, 542 F. Supp. 196, 205 (E.D. Pa. 1982)) (use by employee of former employer's trade secrets or confidential information is irreparable harm warranting injunctive relief).

81.     Additionally, the use of internal client-specific strategies to compete against a company and potentially sour relationships with current clients also can establish irreparable harm. Bimbo Bakeries, 2010 WL 571774 at *4-5, 12-15.

82.     The irreparable harm Mallet would suffer without injunctive relief is varied and evident. Lacayo and Bowers are actively working for a direct competitor in high-level positions in which they have used and disclosed Mallet's trade secrets in violation of their covenants.

83.     Even without Lacayo and Bowers, Bundy/Synova would continue to have access to and use Mallet's information.

84.     The harm Bundy/Synova will visit on Mallet if it is not enjoined will be long-term given that Bundy/Synova is targeting Mallet's customers. The harm to Mallet is magnified by its expanding portfolio of release agents to replace Mallet products.

85.     Without injunctive relief, Defendants' actions will disrupt Mallet's business, harm its relationship with customers and cause loss of market position, reputation and customer goodwill. That harm is almost impossible to quantify, and its effects could be felt for years. Injunctive relief is necessary to prevent continued immediate and irreparable harm.

I.      **Denying injunctive relief would cause greater injury than granting it.**

86.     The purpose of an injunction in a trade secret case is to protect the secrecy of the misappropriated information, eliminate the unfair advantage obtained by the wrongdoer

and reinforce the public policy of commercial morality.  Kewanee Oil Co. v. Bicron Corp.,

416 U.S. 470, 481 (1974).

87.     To determine whether greater injury would result from refusing injunctive relief

than from granting it, the Court should analyze the balance of hardships between the parties.

See Ogontz Controls Co. v. Pirkle, 499 A.2d 593, 597-98 (Pa. Super. 1985).  Defendants are

using Mallet's confidential and trade secret information to Mallet's detriment and for the benefit

of themselves, and will continue to do so if not enjoined.  See id. (finding harm was a

"certainty," where an employee was engaged in unfair competition with his former employer).

88.     It took Mallet years to develop some of its key products, but Synova has made

comparable products within a few months of Lacayo joining the Company.  Based on the legal

standards now applicable, Plaintiff has made a sufficient showing that these comparable products

benefited from Mallet's trade secrets, which Bundy/Synova purposefully sought out from

Mallet's current and former employees.

89.     The resulting damage to Mallet will be incalculable through loss of business,

damage to customer relationships and the loss of protection of its confidential and trade secret

information.  The nature of the relief Mallet requests is proportionate to the severity of

Defendants' wrongful acts and the potential harm.

90.     The harm to Mallet outweighs any harm that Defendants would suffer from being

enjoined from continuing their unlawful conduct.

91.     Especially relevant here is the Third Circuit's recognition that courts should not

insolate a defendant from harm caused by an injunction if the harm is a result of their willful

violations.  See HR Staffing Consultants LLC v. Butts, 627 Fed. App'x 168, 172-174

(3d Cir. Sept. 30, 2015) (affirming District Court's finding that former employer's interest in an

injunction outweighed the harm caused to defendant because defendant "brought any hardship

upon himself") (citing Laidlaw, Inc. v. Student Transp. of Am., Inc., 20 F. Supp. 2d 727, 768

(D. N.J. 1998)) ("where, as here, the employee "willfully breach[ed] a valid restrictive covenant,

the harm to [him] is a predictable consequence of [his] willful breach and . . . is not the type of

harm from which we seek to protect [him]") (internal quotation marks and citations omitted).

92.     Courts have ordered extensive injunctive relief where warranted.  *See, e.g.*,

Christopher M's, 699 A.2d 1272 (affirming a trade secret injunction that permanently enjoined

the defendants from engaging in the manufacture of a product when the defendants' manufacture

of that product was inextricably connected to their knowledge of the plaintiff's trade secrets);

Bimbo Bakeries USA, Inc., 613 F.3d 102 (affirming grant of injunction preventing former VP

bound by restrictive covenants from working for Hostess).

93.     Injunctive relief, of the nature requested, is consistent with a weighing of harms

presented.

**J.      Granting injunctive relief serves the public interest.**

94.     The public interest is served by stopping defendants from using a company's

confidential and trade secret information.  *See* Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,

602 A.2d 1277, 1287-88 (Pa. 1992) ("a fiduciary who breaches his duty of loyalty to his

principal is liable to his principle, and an injunction is a proper remedy for the breach").

95.     Courts have held that granting injunctive relief in these cases *benefits*, not harms,

the public interest.  *See, e.g.,* Merrill Lynch, Pierce, Fenner & Smith v. Masri, 1996 U.S. Dist.

LEXIS 7184, *12 (E.D. Pa. May 28, 1996) ("Issuing a preliminary injunction serves the public

interests of enforcing valid contractual provisions and protecting business investments and

confidential customer information.").

96.     The Court of Appeals for the Third Circuit has found the public interest "favor[s] the imposition of injunctive relief in situations where a new business venture's profitability is depend[e]nt on the use of a competitor['s] trade secrets."  Stream Cos., 2013 WL 12114590 at *16) (citing Bimbo Bakeries, 2010 WL 571774 at *16); *see also* Air Prods. & Chem., Inc. v. Inter-Chem. Ltd., 2003 WL 22917491, *14 (E.D. Pa. Dec. 2, 2003) ("the public interest is furthered by protecting trade secrets from misappropriations by those who have not devoted the time and investment to their development") (citation to quoted source omitted).

97.     Granting injunctive relief "will discourage unfair competition [and] the misappropriation and wrongful use of confidential information and trade secrets."  *See* Nat'l Bus. Servs. v. Wright, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998).  The public interest so is served.

Consistent with the above, the Court hereby enters the following:

**ORDER**

Plaintiffs' Amended Motion for Preliminary Injunction (**Doc. 91**) is **GRANTED**. Before entering an order of injunction, however, the Court believes that further input from the parties is warranted, particularly as relates to the entry of a security bond under Rule 65(c).

Accordingly, counsel for Plaintiff and Defendants shall meet and confer (preferably by videoconference, but at least by telephone) and make best-faith efforts to agree on a proposed order, or to reach agreement on any many terms as possible.  By **December 7, 2020**, the parties jointly shall file a proposed order containing all agreed-upon terms; and, to the extent they cannot agree, a statement of the language proposed by each side.  Although the submission shall not contain further argument regarding matters already decided, the Court expressly holds that

Defendants' participation in this process shall be without prejudice to any arguments made, or positions taken, by them at later stages in this litigation (including on appeal).

The Court will adopt provisions of the proposed order agreed upon by the parties, and where there is disagreement, the Court summarily will adopt the language it believes is most reasonable, appropriate and consistent with the Court's rulings herein.

IT IS SO ORDERED.


November 23, 2020                              s/Cathy Bissoon_____
                                              Cathy Bissoon
                                              United States District Judge

cc (via ECF email notification):

All Counsel of Record