**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MALLET AND COMPANY INC., | ) |
| | ) |
| *Plaintiff*, | ) |
| v. | ) Civil Action No: 2:19-cv-01409-CB |
| | ) |
| ADA LACAYO, RUSSELL T. BUNDY | ) |
| ASSOCIATES, INC., d/b/a BUNDY | ) |
| BAKING SOLUTIONS, SYNOVA, LLC, | ) The Honorable Cathy Bissoon |
| and WILLIAM "CHICK" BOWERS, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |
|  | ) |

**MALLET AND COMPANY INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR
ATTORNEYS' FEES AND COSTS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 1

ARGUMENT ............................................................................................................ 3

I.   Mallet Is Eligible for Reasonable Attorneys' Fees and Expenses. ................... 4

  A.   Mallet is the prevailing party. ................................................................ 4

  B.   Defendants willfully and maliciously misappropriated Mallet's trade secrets. ...... 5

II.  The Requested Fees are Reasonable. ................................................................ 6

  A.   Billing Rate ............................................................................................ 6

    1.   Mayer Brown ............................................................................ 7

      a.   Special Expertise Exception ........................................... 7

      b.   Mayer Brown's rates are reasonable for Washington, D.C. .......... 9

      c.   Mayer Brown's rates are also reasonable for the Western District of Pennsylvania .............................................. 11

    2.   Jackson Lewis ........................................................................ 11

  B.   The hours devoted to the litigation were reasonable. .......................... 12

    1.   The litigation was difficult, complex, and lengthy. ................ 12

    2.   The issues were of great importance to Mallet. ..................... 14

    3.   Defendants engaged in other scorched-earth tactics. ............. 15

    4.   Mallet's counsel appropriately staffed the case and limited its hours. ..... 17

III. The requested expenses are reasonable. ......................................................... 19

CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Legal Defense Fund v. Lucas*,
2021 WL 4479483 (W.D. Pa. Sep. 30, 2021) .....................................................................9, 12

*B & B Microscopes v. Armogida*,
532 F. Supp. 2d 744 (W.D. Pa. 2007) ......................................................................................5

*Blum v. Stenson*,
465 U.S. 886 (1984) ...............................................................................................................19

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*,
532 U.S. 598 (2001) .................................................................................................................4

*Drake v. Perrin*,
593 F. Supp. 1176 (E.D. Pa. 1984) ..........................................................................................4

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
426 F.3d 694 (3d Cir. 2005) ........................................................................................6, 7, 9, 12

*Mattern & Assocs. v. Seidel, L.L.C.*,
678 F. Supp. 2d 256 (D. Del. 2010) ..............................................................................3, 4, 5, 6

*Mozingo v. Oil States Energy Servs.*,
2018 WL 4473345 (W.D. Pa. Sep. 18, 2018) ..........................................................................9

*Nittany Outdoor Adver., LLC v. College Twp.*,
2015 WL 1537616 (M.D. Pa. Apr. 6, 2015) ....................................................................7, 8, 9

*PetroChoice Holdings, Inc. v. Orobono*,
2022 WL 138008 (E.D. Pa. Jan. 14, 2022) .................................................................... *passim*

*Poulter v. Ford Motor Co.*,
1997 WL 22673 (E.D. Pa. Jan. 17, 1997) ..............................................................................19

*PPG Indus. Inc. v. Jiangsu Tie Mao Glass Co.*,
2022 WL 247755 (W.D. Pa. Jan. 27, 2022) .................................................................. *passim*

*Pub. Int. Rsch. Grp. v. Windall*,
51 F.3d 1179 (3d Cir. 1995) ...................................................................................................12

*Rayna P. v. Campus Cmty. Sch.*,
390 F. Supp. 3d 556 (D. Del. 2019) .........................................................................................7

*Saleh v. Moore*,
    95 F. Supp. 2d 555 (E.D. Va. 2000), *aff'd* 11 F. App'x 241 (4th Cir. 2001) .........................15

*In re Schering-Plough Corp.*,
    2013 WL 5505744 (D.N.J. Oct. 1, 2013)..................................................................................15

*Sec. & Data Tech., Inc. v. Sch. Dist. of Philadelphia*,
    2016 WL 7427758 (E.D. Pa. Dec. 20, 2016)..........................................................................15

*Warman v. Local Yokels Fudge, LLC*,
    2025 WL 1134908 (W.D. Pa. Apr. 16, 2025)...........................................................................4

**Statutes**

12 Pa. C. S. § 5305.........................................................................................................................2, 4

12 Pa. C.S. § 5305(3)......................................................................................................................1, 4

18 U.S.C. § 1836(b)(3)(D)..............................................................................................................1, 4

215 U.S.C. § 2. ...............................................................................................................................2, 8

**Other Authorities**

Fed. R. Civ. P. 50..............................................................................................................................14

Fed. R. Civ. P. 54(d)(1).......................................................................................................................4

Fed. R. Civ. P. 59..............................................................................................................................14

## INTRODUCTION

After more than five years of hard-fought litigation, a jury unanimously found that Defendants engaged in a brazen scheme to steal Mallet's proprietary formulas, poach its key employees, and launch competing products unfairly using Mallet's confidential information. To achieve that outcome, Mallet overcame a scorched-earth defense strategy in which Defendants repeatedly shifted theories, expanded the scope of the case with baseless counterclaims, and forced Mallet to expend enormous resources to protect its intellectual property and defend its reputation. Despite Defendants' tactics, Mallet prevailed on every single claim submitted to the jury.

Given the overwhelming record evidence of willful and malicious misappropriation—as well as the extraordinary effort required to hold Defendants accountable for their actions through this litigation—this Court should award reasonable attorneys' fees and costs under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(3)(D), and the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S. § 5305(3). For the reasons that follow, Mallet respectfully requests an award in the amount of $11,397,874.15, reflecting the reasonable fees, costs, and expenses incurred by both of its law firms—Jackson Lewis P.C. and Mayer Brown LLP. The requested amount reflects the actual fees incurred in litigating this case through trial and is based on reasonable hourly rates, time entries, and staffing levels.

## BACKGROUND

As is evident from the trial record, Defendants in this case sought to rapidly accelerate Synova's startup by recruiting Mallet's employees, paying them for Mallet trade secrets and proprietary information, and ultimately using that purloined information to try to displace Mallet in the marketplace for release agents. After recruiting two of Mallet's key former employees, Ada Lacayo and William Bowers, Defendants Bundy Baking Solutions ("Bundy") and Synova, LLC ("Synova") used Bowers and Lacayo's knowledge of Mallet's confidential formulas, technical

1

methods, and customer relationships to develop nearly-identical baking release agents and marketed them as equivalent to Mallet's products. Defendants gained a substantial commercial advantage as a result and caused Mallet to suffer millions in lost profits.

Mallet first retained Pittsburgh counsel from the law firm Jackson Lewis when it filed this lawsuit in 2019. *See* ECF No. 1; Decl. of Alison Butler ("Butler Decl.") ¶ 3. The complaint alleged breach of contract and trade secret misappropriation under the Defend Trade Secrets Act and the Pennsylvania Uniform Trade Secrets Act, along with related tort claims. *See* ECF No. 1 at 12–24. Mallet chose Jackson Lewis based on the firm's strong reputation for employment litigation. Butler Decl. ¶ 3.

However, the scope of the litigation changed dramatically when Bundy and Synova filed amended counterclaims. *See* ECF No. 163. Those counterclaims added Vantage as a party and alleged violations of Section 2 of the Sherman Act based on purported below-cost pricing and monopolization in the North American market for baking release agents. *See id*.; Butler Decl. ¶ 4. These claims expanded the litigation, introducing nationwide antitrust issues with potential exposure to treble damages and the risk of follow-on class action lawsuits and government investigations.

Mallet determined that Jackson Lewis lacked the specialized antitrust expertise needed to defend against the amended counterclaims. Butler Decl. ¶ 6. After a diligent search, Mallet concluded that no law firm in the Pittsburgh area had the requisite experience to handle complex, nationwide antitrust litigation. *Id*. Mallet accordingly retained Mayer Brown LLP, a firm with a national reputation for handling sophisticated commercial and antitrust matters. *Id*. ¶ 7.

Although Defendants voluntarily dismissed their antitrust counterclaims after the close of expert discovery more than a year later, *see* ECF No. 249, by that point Mayer Brown had already

2

become deeply involved in the case. As Vantage's then-General Counsel explained, Mayer Brown had developed Mallet's litigation strategy and was helping prepare the case for summary judgment and trial. Butler Decl. ¶ 8. Given the investment already made in bringing Mayer Brown up to speed, and the firm's broader commercial litigation expertise, Mallet kept Mayer Brown as lead counsel for the remainder of the case. *Id.*

That decision cannot be second-guessed. Following a trial, the jury returned a verdict in favor of Mallet on every claim. *See* ECF No. 496. The jury found that Bundy and Synova's misappropriation of Mallet's trade secrets was willful and malicious, and awarded $7,250,010 in total damages, including $3,000,001 in punitive damages. *Id.* at 4.

## ARGUMENT

To determine the total amount of attorneys' fees and expenses recoverable in this case, the Court should proceed in three steps. First, it should confirm that Mallet is eligible for an award of fees and expenses under DTSA and PUTSA, which authorize such an award to the prevailing party if the misappropriation of trade secrets was willful and malicious. Second, the Court should determine the amount of reasonable attorneys' fees by calculating the appropriate hourly rates and the number of hours reasonably expended. And third, the Court should determine the amount of reasonable expenses and then add that sum to the amount of reasonable fees to arrive at the total award. As set forth below, Mallet is eligible to recover fees and costs in the amount of $11,397,874.15. That amount reflects $9,042,621.89 in fees and $42,033.27 in expenses for Mayer Brown and $1,949,606 in fees and $363,612.99 in expenses for Jackson Lewis. *See* Zarlenga Decl. ¶ 61; Pressley Decl. ¶ 47 & Ex. 4.

## I.   MALLET IS ELIGIBLE FOR REASONABLE ATTORNEYS' FEES AND EXPENSES.

DTSA and PUTSA both permit an award of reasonable attorneys' fees to the "prevailing party" if a trade secret was "willfully" and "maliciously" misappropriated.   *See* 18 U.S.C. § 1836(b)(3)(D); 12 Pa. C. S. § 5305(3).   PUTSA permits an award of "expenses and costs" to the prevailing party in addition to reasonable attorney fees.[1]   12 Pa. C. S. § 5305.   Mallet satisfies the applicable requirements here and is therefore eligible for reasonable attorneys' fees and expenses.

### A.   Mallet is the prevailing party.

Mallet is the "prevailing party" in this litigation under DTSA and PUTSA.   A "prevailing party" is "one who has been awarded some relief by a court."   *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 598-99 (2001).   That includes obtaining a favorable verdict at a jury trial.   *See Drake v. Perrin*, 593 F. Supp. 1176, 1177 (E.D. Pa. 1984).   Courts in this district apply this definition of "prevailing party" in fee determinations under DTSA and PUTSA.   *See, e.g.*, *Warman v. Local Yokels Fudge, LLC*,  2025 WL 1134908, at *4 (W.D. Pa. Apr. 16, 2025).

Mallet prevailed in this litigation.   The jury reached a verdict in Mallet's favor on all eight of its claims.   *See* ECF 496.   The jury then awarded Mallet $7,250,010 in damages, including

---

[1] While DTSA permits an award of reasonable attorney's fees in cases of willful and malicious misappropriation, *see* 18 U.S.C. § 1836(b)(3)(D), it does not expressly address the recovery of litigation expenses.   PUTSA, however, expressly states a court may award to the prevailing party "expenses and costs," in addition to reasonable attorney fees.   12 Pa. C. S. § 5305.   In any event, litigation costs are also recoverable under Federal Rule of Civil Procedure 54(d)(1), which provides that costs "should be allowed to the prevailing party" unless a federal statute, court rule, or court order provides otherwise.   Because no such limitation appears in DTSA or any court rule or order, and because PUTSA expressly authorizes recovery of costs, Mallet is entitled to an award of its reasonable litigation expenses here.

$4,250,009 in compensatory damages and $3,000,001 in punitive damages.  *See* Zarlenga Decl.
¶ 33.  Mallet is therefore the "prevailing party" under DTSA and PUTSA.

**B.**   **Defendants willfully and maliciously misappropriated Mallet's trade secrets.**

Defendants' misappropriation of Mallet's trade secrets was willful and malicious.  Under
both the DTSA and PUTSA, conduct is willful and malicious when it is undertaken with
knowledge of wrongdoing and either an intent to harm or a reckless indifference to the rights of
others.  *See Mattern & Assocs. v. Seidel, L.L.C.*, 678 F. Supp. 2d 256, 271 (D. Del. 2010)  (DTSA);
*PetroChoice Holdings, Inc. v. Orobono*, , 2022 WL 138008, at *5 (E.D. Pa. Jan. 14, 2022)
(PUTSA).  In *PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co.*, for example, a court in this district
found willful and malicious misappropriation where, much like here, a competitor paid a former
employee of the plaintiff to secretly funnel trade secrets over a multi-year period, then used those
secrets to build out competing manufacturing capabilities.  *See*  2020 WL 1526940, at *20-22.
(W.D. Pa. Mar. 31, 2020).  The court emphasized that the defendants had acted with intent and
deceptive purpose, fully aware that they were harming a Pennsylvania-based competitor and
deliberately targeting its proprietary business interests.  *See id.*; *see also B & B Microscopes v.
Armogida*, 532 F. Supp. 2d 744, 756-57 (W.D. Pa. 2007) (similar).

The jury here expressly found that Defendants' misappropriation was willful and
malicious.  *See* ECF No. 496 at 4.  It is easy to see why.  Synova and Bundy first sought Mallet's
trade secret and proprietary information directly from Shane Zhou—and paid cash after Mr. Zhou
delivered.  Bundy and Synova then hired Ada Lacayo and William Bowers directly into roles that
closely mirrored the positions they held at Mallet, fully aware that both retained their access to
Mallet confidential information.  Bundy and Synova then directly solicited and exploited the
confidential information Lacayo and Bowers possessed and quickly began launching new products
that incorporated virtually identical materials and formulations to those developed by Mallet.

5

Defendants engaged in a calculated effort to leverage Mallet's trade secrets for Synova's benefit, despite knowing their improper origin.  The jury's verdict confirmed what the record plainly shows: Defendants acted deliberately, and at the very least with reckless disregard for Mallet's rights.  Such behavior is sufficient to show willful and malicious misappropriation under both federal and state law.

In sum, Mallet is eligible for an award of attorneys' fees under DTSA and PUTSA because it is the prevailing party and defendants' misappropriation of its trade secrets was willful and malicious.

## II.   THE REQUESTED FEES ARE REASONABLE.

Courts in this circuit determine the size of a prevailing party's fee award by determining (i) the appropriate billing rate for the party's attorneys and (ii) the number of hours those attorneys reasonably expended on the action.  *Interfaith Cmty. Org. v. Honeywell Int'l, Inc*., 426 F.3d 694, 703 n.5 (3d Cir. 2005)).  The party seeking attorneys' fees bears the burden of showing that its requested hourly rates and the hours it claims are reasonable, and can satisfy this burden by "submit[ing] evidence supporting the hours worked and rates claimed."  *Id.*

### A.   Billing Rate

Courts engage in a two-step inquiry to determine the appropriate billing rate.  *First*, the court should identify the appropriate geographic market on which to base the reasonableness determination.  *Second*, it should assess whether the rates claimed are reasonable for that market. *See Interfaith*, 426 F.3d at 703-08; *PPG Indus. Inc. v. Jiangsu Tie Mao Glass Co.*, 2022 WL 247755, at *5-11 (W.D. Pa. Jan. 27, 2022).

In determining the appropriate geographic market, the default rule, commonly referred to as the "forum rate rule," is that courts will look to the prevailing rates in the forum in which the court sits.  *PPG Indus.*, 2022 WL 247755, at *3 (quoting  *Interfaith*, 426 F.3d at 705).  But the

6

forum rate rule does not apply where the prevailing party demonstrates that out-of-district counsel was hired for their special expertise, and comparable expertise was not available locally.  Under this "special expertise" exception, courts may award fees based on the prevailing rates in the community where the attorneys actually practice, rather than the forum district.  *Id.* (citing *Interfaith*, 426 F.3d at 705–06).  As the Third Circuit Task Force explained, this exception recognizes that "where a firm brings particular expertise to a forum, there is a legitimate basis on which to compensate counsel using rates from the venue where they are located."  *Rayna P. v. Campus Cmty. Sch.*, 390 F. Supp. 3d 556, 566 (D. Del. 2019) (quoting *Court Awarded Attorney Fees*, 108 F.R.D. 237, 249 n.40 (3d Cir. 1986)).

### 1.    Mayer Brown

#### a.    Special Expertise Exception

This Court should apply the special expertise exception and assess Mayer Brown's rates based on the prevailing market in Washington, D.C.  Courts applying the special expertise exception to the forum rate rule consider three factors: (i) the complexity of the case at the time the plaintiff retained counsel; (ii) whether the plaintiff rationally concluded that out-of-forum counsel possessed specialized expertise needed for the litigation; and (iii) whether comparable expertise was unavailable within the forum.  *See PPG Indus.*, 2020 WL 1526940, at *25–26  (citing *Interfaith*, 426 F.3d at 706); *Nittany Outdoor Adver., LLC v. College Twp.*, 2015 WL 1537616, at *5 (M.D. Pa. Apr. 6, 2015).  Each factor supports applying the special expertise exception here.

*First*, the case had become exceedingly complex at the time Mallet retained Mayer Brown. As the then-General Counsel of Vantage—Mallet's parent company—explained in her declaration, Mallet initially retained Jackson Lewis to litigate a breach of contract and trade secret dispute with former employees and a competitor.  Butler Decl. ¶ 3.  But the scope of the litigation expanded significantly when the Bundy Defendants amended their counterclaims to add Vantage as a party

7

and assert antitrust claims under Section 2 of the Sherman Act.  *See* ECF No. 163; Butler Decl. ¶ 4.  Those counterclaims implicated Mallet's and Vantage's pricing practices nationwide and exposed them to treble damages and the risk of follow-on class action litigation.  *Id.* ¶¶ 4-6.  The litigation thus transformed into a higher-stakes, national antitrust case.  Courts have found this first factor satisfied in cases of comparable complexity.  *See, e.g.*, *PPG Indus.*, 2020 WL 1526940, at *26 (applying the special expertise exception to a "remarkably complex" international trade secret dispute); *Nittany Outdoor*, 2015 WL 1537616, at *5 (First Amendment challenge to local ordinance).

*Second*, Mallet acted rationally in concluding that it needed out-of-forum counsel with specialized antitrust experience.  Ms. Butler recognized that the antitrust counterclaims posed substantial legal and strategic risks and determined that the Jackson Lewis employment litigation team could not provide adequate representation.  Butler Decl. ¶ 6.  She accordingly conducted a careful search for a firm with the experience to handle complex antitrust claims, particularly one capable of defending against both direct antitrust liability and any future class actions based on overlapping conduct.  *Id.* ¶¶ 6-7.  Mallet and Vantage concluded that Mayer Brown fit that need given the firm's extensive experience handling nationwide antitrust and class action litigation in the food sector.  *Id.* ¶ 7.  In particular, Ms. Butler identified lead counsel Carmine Zarlenga—who has nearly 40 years of experience litigating antitrust and trade secret cases, including class actions, in the food and beverage industry—as an ideal fit to lead the case.  *Id.* ¶¶ 8-9; *see also* Zarlenga Decl. ¶¶ 9-11.  A plaintiff's reasoned and supported belief in the unique qualifications of out-of-forum counsel suffices to satisfy the second prong of the test.  *Nittany Outdoor*, 2015 WL 1537616, at * 5-6.

8

*Third*, and critically, comparable expertise was not available within the Western District of Pennsylvania.  Ms. Butler expressly concluded that neither Jackson Lewis nor any other Pittsburgh-based firm had the antitrust expertise necessary to handle claims of this nature and magnitude.  That determination was based on her professional experience, a diligent search, and consultations with trusted colleagues.  Butler Decl. ¶¶ 6-8.  Courts have accepted sworn declarations like Ms. Butler's as sufficient evidence that local counsel with comparable experience was unavailable.  *See PPG Indus.*, 2022 WL 247755, at *7–8; *Nittany Outdoor*, 2015 WL 1537616, at * 5-6.

Because all three factors support the special expertise exception, this Court should evaluate Mayer Brown's billing rates based on the prevailing rates in Washington, D.C., where Mr. Zarlenga and his team are located.

b.    <u>Mayer Brown's rates are reasonable for Washington, D.C.</u>

Mayer Brown's rates are reasonable for the Washington, D.C. legal market.  In determining "the prevailing market rates in the relevant community," the court "must assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Interfaith*, 426 F.3d at 708.  Courts in this district routinely apply that standard.  *See, e.g.*, *Animal Legal Defense Fund v. Lucas*, 2021 WL 4479483, at *1 (W.D. Pa. Sep. 30, 2021); *Mozingo v. Oil States Energy Servs.*, 2018 WL 4473345, at *4 (W.D. Pa. Sep. 18, 2018).

To make the cost of litigation more affordable for Mallet and Vantage, Mayer Brown discounted its hourly rates by 25%.  Zarlenga Decl. ¶ 14.  David Duffus, who Mallet retained to perform an accounting and financial analysis of its claim for fees, analyzed the invoices and determined that the blended hourly billing rate for Mayer Brown was $706.27.  Duffus Decl. ¶ 11. As determined by Corey Tobeck, Global Director of Client Pricing and Rates Management for

9

Mayer Brown, these rates are consistent with those charged by peer firms in the Washington, D.C. market. Mr. Tobeck explained in his sworn declaration that Mayer Brown sets its rates annually based on available market data, including rates charged by AmLaw 50 firms and a smaller group of similarly situated firms with which Mayer Brown regularly competes. Tobeck Decl. ¶¶ 6-8. Annual rate increases reflect the rising costs of delivering high-quality legal services in a competitive and complex environment, including salaries and benefits for attorneys and their support staff. *Id.* ¶ 7.

The data make clear that Mayer Brown charged less in this litigation than its peers at every level, from junior staff to senior attorneys. *See* Kaiser Decl. ¶ 16; Tobeck Decl., Exs. 1-3. In 2024, for example, Mayer Brown's standard rates were on average 12% lower than those charged by its peer group. Tobeck Decl. ¶ 18. That has been true throughout the litigation: in both 2022 and 2023, Mayer Brown's standard rates averaged 14% less than its peer firms. *Id.* ¶ 19. And the firm's negotiated, billed rates have likewise been consistently lower than those of its competitors. *Id.* ¶ 20. Given that Mayer Brown provided Mallet and Vantage with a 25% discount off its standard rates, *see* Zarlenga Decl. ¶ 14, the firm's fees in this litigation are plainly reasonable. Matthew Kaiser, the former Chair of Washington D.C.'s Board on Professional Responsibility, reviewed this data and opined that "on average Mayer Brown's standard billing rates and the actual, negotiated rates for the Litigation were significantly and consistently lower than the median peer group." Kaiser Decl. ¶ 16. Mayer Brown's rates are thus reliably below those charged by firms that litigate antitrust and complex trade secret matters, and thus are reasonable and should be adopted by the Court here.

c.   Mayer Brown's rates are also reasonable for the Western District of Pennsylvania

Even if the Court declines to apply the special expertise exception to the forum rate rule, Mayer Brown's discounted rates remain reasonable for the Western District of Pennsylvania. William Pietragallo, who has extensive experience practicing in Pennsylvania and was retained by Mallet to offer expert opinions on the reasonableness of the request for fees, explained that there is typically a broad range of hourly rates for complex commercial litigation that depends on attorney experience, client relationships, and case complexity. *See* Pietragallo Decl. ¶ 68. Senior litigation partners in this forum typically charge between $750 and $1,000 per hour, while associate rates generally fall between $300 and $600. *Id.* Mayer Brown applied a 25% discount to its standard national rates, resulting in rates of approximately $1,050 for Mr. Zarlenga and $300 to $400 for more junior attorneys. *Id.* In light of the complexity and national scope of this case, and the substantial discount Mayer Brown extended, Mayer Brown's rates are well within the range of what is reasonable and customary for this jurisdiction. *Id.* They reflect both the firm's good-faith effort to control costs and the market realities of litigating a case of this magnitude in this district. *Id.*

### 2.   Jackson Lewis

This Court should assess Jackson Lewis's rates based on the prevailing rates in Pittsburgh, Pennsylvania. The rates charged by Jackson Lewis in this litigation are reasonable for the Pittsburgh market, particularly in light of the discounts the firm extended to Mallet. Jackson Lewis applied discounts to its standard billing rates ranging from approximately 7% to 12%. Presley Decl. ¶ 40; Pietragallo Decl. ¶ 87. As a result, the effective rates charged ranged from approximately $185 to $730 per hour in both 2019 and 2020, with paralegal rates at the lower end of that range and partner rates at the higher end. Pietragallo Decl. ¶ 87. In 2021, the discounted

11

rates ranged from approximately $167 to about $761, and remained consistent into 2022 and 2023. *Id.*

Across the entire litigation, the average hourly rate billed by Jackson Lewis was approximately $350. Pietragallo Decl. ¶ 88. This figure shows that Jackson Lewis staffed the matter efficiently, with lower-billing attorneys performing the majority of the work. Based on Mr. Pietragallo's more than 50 years of experience in the Pittsburgh legal market, Jackson Lewis's rates are more than reasonable for a matter of this scope and complexity. *Id.* ¶ 88.

**B.    The hours devoted to the litigation were reasonable.**

After determining the appropriate hourly rate, the Court must assess the amount of hours reasonably expended on the litigation. *Interfaith*, 426 F.3d at 703 n.5. In doing so, it must exclude hours that are "excessive, redundant, or otherwise unnecessary." *Animal Legal Defense Fund*, 2021 WL 4479483, at *2 (quoting *Pub. Int. Rsch. Grp. v. Windall*, 51 F.3d 1179, 1188 (3d Cir. 1995). Mallet's counsel devoted a total of 18,360.40 hours to this matter, which consists of 12,803.40 hours incurred by Mayer Brown and 5,557 incurred by Jackson Lewis. Duffus Decl. ¶ 10. As explained below, all of that time was reasonably expended and is therefore compensable.

**1.    The litigation was difficult, complex, and lengthy.**

One reason Mallet's counsel devoted substantial time to this matter is self-evident: this has been a sprawling and protracted litigation. Now in its sixth year, the case has involved hard-fought disputes at every stage. The Court is well aware of the matter's complexity and intensity, as reflected in the nearly 600 docket entries to date. The extraordinary effort required to litigate this case is detailed in the declaration of Mayer Brown's Carmine Zarlenga, Mallet's lead counsel in this litigation.

Fact discovery in this case was unusually extensive. *See* Zarlenga Decl. ¶¶ 16-17. In light of Defendants' sustained efforts to conceal their misappropriation of Mallet's trade secrets and

confidential information—up to and even during the litigation—the Court ordered them to produce full forensic images of multiple devices and data sources in their possession. *Id.* ¶ 16. Mayer Brown attorneys then undertook a careful and time-intensive review of that data to identify relevant documents and analyze them for use in depositions, motions practice, and trial. This process alone required hundreds of attorney hours. *Id.* ¶ 17. Defendants introduced a lengthy and wasteful detour in the case when they sought voluminous tax records from both Vantage and Mallet, as well as their accounting firms, and conducted depositions on those records. Defendants never asked a single question about any tax records at trial, yet they wasted months of the parties' time in discovery, depositions, and extensive motions practice on a never-revealed tax "theory." *Id.* ¶ 19. Between the various parties, counsel prepared for and conducted dozens of fact witness depositions, each demanding substantial time and effort. *Id.* ¶ 18.

Expert discovery was similarly extensive. Mallet initially engaged four experts: Andrew Reisman, a digital forensics and electronic discovery expert; Dr. Eric Decker, a professor in the food science industry; John Scalf, an economist who carefully evaluated the Bundy Defendants' predatory pricing counterclaim; and Robert McSorley, a damages expert. Zarlenga Decl. ¶ 20. Defendants then engaged six experts, including on irrelevant topics such as patent law. In response, Mallet engaged four additional experts to prepare rebuttal reports. *Id.* ¶ 21-23. Mr. Zarlenga determined that these additional experts were necessary in light of the complexity of the issues involved in Defendants' expert opinions. *See* Zarlenga Decl. ¶¶ 22-23. Depositions of the 14 expert witnesses involved in this case required significant time and preparation by counsel, reflecting the complexity and high stakes of the expert issues in this case. *Id.* ¶ 24. And, despite Defendants' escalation of expert discovery related to its antitrust counterclaims, Defendants dropped those claims right after the close of expert discovery. *Id.* ¶ 25.

Motions practice in this case also demanded substantial time and resources. The parties filed cross-motions for summary judgment, with Defendants seeking summary judgment on all nine claims asserted against them and Mallet seeking summary judgment on the three remaining counterclaims. In preparing the voluminous briefing and exhibits, Mayer Brown attorneys meticulously reviewed numerous documents to ensure that no confidential or trade secret information was improperly filed on the public docket. Zarlenga Decl. ¶ 27; Pietragallo Decl. ¶ 33. This was a critical task because Mallet's proprietary information could lose economic value if publicly disclosed. Zarlenga Decl. ¶ 25. The parties subsequently filed dozens of pretrial motions, including motions in limine and Daubert motions. *Id.* ¶ 29. And following a five-day jury trial in which 21 witnesses presented testimony, Mallet filed a number of post-trial briefs including a motion for permanent injunction, a motion for sanctions, a motion for prejudgment and post-judgment interest, a bill of costs, responses to Defendants' Rule 50 and Rule 59 motions, as well as the instant motion for attorneys' fees. *Id.* ¶¶ 29-36.

### 2. The issues were of great importance to Mallet.

The issues at stake in the case were of paramount importance to Mallet and justified the significant resources devoted to the litigation. Defendants' conduct threatened Mallet's core business, including its most successful trade secret release agent formulas, developed over years of research and investment. The misappropriation and misuse of that confidential information posed an existential risk to Mallet's competitive standing in the industry. Bundy and Synova had taken Mallet's formulas to make and sell what were essentially Mallet's *own products* into the market at reduced prices. It was therefore essential for Mallet to bring this action to safeguard the company's long-term business model, client relationships, and market reputation.

The litigation also raised complex factual and legal questions that required careful and sustained attention from counsel. In addition to facing the burden of proving the scope and value of

14

its trade secrets and confidential information, Mallet was forced to rebut aggressively-litigated (but entirely meritless) counterclaims that Defendants used to undermine Mallet's position and shift liability.  Butler Decl. ¶¶ 4-6; Zarlenga Decl. ¶¶ 11-12.  Defendants' antitrust counterclaims sought to reframe Mallet's legitimate business practices, and this lawsuit, as unlawful and anticompetitive, threatening reputational damage, potential treble damages, and years of costly additional litigation. Butler Decl. ¶ 5.  Defendants' actions thus forced Mallet to engage in substantial discovery, retain an expert economist, and dedicate substantial resources to rebutting these meritless claims, which were ultimately dismissed with prejudice.  *See* Zarlenga Decl. ¶¶ 37-38.  The aggressive nature of those counterclaims elevated the litigation risk significantly and further supports the reasonableness of the time and resources Mallet was required to expand.

### 3.    Defendants engaged in other scorched-earth tactics.

The number of hours expended in this case is also a product of Defendants' scorched-earth litigation tactics.  Courts routinely recognize that when a party chooses to litigate in this manner— *i.e*., by contesting every issue, repeatedly forcing extensive motion practice, and escalating the complexity of the case—it must bear the resulting costs if its defense is ultimately unsuccessful. *See, e.g*, *Sec. & Data Tech., Inc. v. Sch. Dist. of Philadelphia*,  2016 WL 7427758, at \*22 (E.D. Pa. Dec. 20, 2016); *In re Schering-Plough Corp.*, 2013 WL 5505744, at \*44 (D.N.J. Oct. 1, 2013); *Saleh v. Moore*, 95 F. Supp. 2d 555, 574 (E.D. Va. 2000), *aff'd* 11 F. App'x 241 (4th Cir. 2001). So too here.  Defendants fought this case with maximal resistance from the beginning, which forced Mallet's counsel to devote significant time and resources to protect Mallet's rights and prepare the case for trial.  Having elected to pursue a defense of this nature, Defendants must now bear the cost of the fees reasonably incurred in defeating it.

Though not easily, Mallet uncovered evidence that Defendants had gone to great lengths to conceal their misappropriation, including using aliases and false e-mail accounts in communications

with former Mallet employees. Zarlenga Decl. ¶ 37. Moreover, Mallet discovered early on that numerous documents had been destroyed when Lacayo and Bowers "lost" and "reset" various electronic devices. Pressley Decl. ¶ 5. Based on these findings, the Court ordered Defendants to produce full forensic images of multiple devices—an unusually invasive remedy—rather than relying on standard electronic search protocols. This resulted in a massive production of information that required Mallet's counsel to conduct a painstaking review of raw data to identify relevant documents for use in the litigation. Zarlenga Decl. ¶ 39.

Meanwhile, Defendants asserted five counterclaims, including a sweeping set of antitrust claims that were entirely meritless and ultimately voluntarily dismissed with prejudice. *Id.* ¶¶ 40-42. Defendants' 30(b)(6) witness admitted that Defendants had **no** factual support for the predicate elements of the predatory pricing claim at the time of pleading. *Id.* ¶ 41. *See* 11/29/22 W. Hallmark Dep. Tr. at 130:19-131:5, Zarlenga Decl. Ex. 2 ("Q: …Does Synova have information about any specific transactions i.e. customer name, product, in which Mallet sold Mallet products to that customer below Mallet's costs? A: At the time this claim was filed, no. We requested items through discovery and we may have that information now. We may get that information now. Discovery is ongoing."). Yet Mallet was still forced to incur substantial fees to investigate and rebut the allegations, including through the retention of an expert economist to respond to the now-dismissed claims. *Id.* ¶¶ 42-43.

Defendants' misconduct extended into expert discovery. For example, the patent expert retained by Defendants to opine that Mallet's trade secrets were in the public domain admitted when pressed in his deposition that he had found no public source disclosing Mallet's formulations. Zarlenga Decl. ¶ 43. The Court excluded his testimony entirely, citing the risk of juror confusion and "wast[ed] time." *Id.*, Zarlenga Decl. Ex. 3. Defendants also offered a reverse-engineering

expert, but provided him with Mallet's precise formulas in advance, which he admitted he reviewed and used, and which prompted the Court to exclude him as well. *Id.* ¶ 47. Yet Mallet had no choice but to engage and prepare rebuttal experts in response to both witnesses.

Even after trial, Defendants continued their reckless litigation conduct. In their opposition to Mallet's motion for a permanent injunction, Defendants publicly disclosed a portion of the precise composition for one of Mallet's trade secret formulas. Zarlenga Decl. ¶ 48. First, Defendants claimed the information was decipherable from public patents; then, they claimed the information was decipherable from the public trial record. Both claims were undeniably false. Despite being immediately alerted to the breach, they refused to withdraw or redact the filing, forcing Mallet to seek emergency relief from the Court. *Id.* Defendants then brazenly moved to strike Mallet's request. The Court admonished Defendants, warning that it would not "not allow what remains of this case to degenerate into a free-for-all" and that any further infractions would be met with "significant[ ] and swift" consequences. *Id.* (quoting ECF No. 522).

### 4. Mallet's counsel appropriately staffed the case and limited its hours.

Mallet's counsel made deliberate staffing decisions throughout the litigation to ensure that work was performed efficiently and by attorneys with the appropriate experience and expertise. Mallet first retained Jackson Lewis when it brought this suit in 2019. Butler Decl. ¶ 3. The Jackson Lewis team initially consisted of principal Marla Presley and then-associates Laura Bunting and Allison Folk. Presley Decl. ¶¶ 27-29. This core litigation team handled every aspect of the case until Defendants Bundy and Synova asserted antitrust counterclaims in 2022. *Id.* ¶ 30; Butler Decl. ¶¶ 6-8.

When Mayer Brown was first retained in 2022, the core team consisted of lead counsel Carmine Zarlenga, then fifth-year associate Catherine Medvene, and then third-year associate Nicholas Ronaldson. Zarlenga Decl. ¶ 50. Mr. Zarlenga also brought in Brantley Webb, a partner

with experience in complex civil litigation and trade secret matters, to help develop the litigation strategy. Although other junior attorneys, paralegals, and support staff assisted with discovery and document review during that year, the primary responsibility for the litigation remained with this small, focused group. *Id.*

As the case progressed into expert discovery in 2023, additional attorneys were brought in only as necessary to handle the demands of that phase. Mr. Zarlenga added three associates— Cecilia Rambarat, Elaine Liu, and Andrew Spadafora—along with Partner Erick Palmer. Zarlenga Decl. ¶ 53. Mr. Palmer and Ms. Rambarat are both registered patent attorneys and worked with Mallet's experts to respond to technical expert opinions related to trade secret disclosure and public domain issues. *Id.* Ms. Liu and Mr. Spadafora are litigation associates and assisted Mallet's other experts in the preparation of their reports and depositions. *Id.* As the parties moved into the summary judgment phase, the team expanded slightly to address the heavy briefing load. In addition to the existing team, associate Anna Durham was added to support the preparation of summary judgment briefs. The attorneys most actively involved at this stage were Mr. Zarlenga, Ms. Webb, Ms. Liu, Ms. Rambarat, and Mr. Spadafora. *Id.* ¶ 54.

Following summary judgment, staffing was again adjusted to match the litigation's needs. Mr. Spadafora and Ms. Liu stepped off the case, and in early 2025, Mr. Zarlenga added associates Whitney Suflas and counsel Eric White to help manage the substantial volume of *Daubert* and motions in limine that required rapid responses as well as pretrial preparation more generally. Zarlenga Decl. ¶ 56. The pretrial and trial team ultimately included Mr. Zarlenga, Ms. Webb, Mr. Palmer, Ms. Medvene, Ms. Suflas, Ms. Rambarat, Mr. White, and Ms. Durham. *Id.* ¶ 56. They were supported by technical staff and two experienced paralegals, who handed trial logistics and exhibit management. In the post-trial phrase, in light of Mr. Palmer's departure from the firm, Mr.

Zarlenga added attorneys Graham White and Jennifer Weinberg to assist with briefing on post-trial motions. *Id.* ¶ 58. The post-trial team included these two attorneys along with Mr. Zarlenga, Ms. Webb, Mr. Eric White, and Ms. Rambarat. *Id.*

Throughout the litigation, Mallet's counsel exercised restraint in staffing and assigned work in a manner consistent with the demands of each phase. Attorneys were added only when necessary and responsibilities were carefully tailored to their subject-matter expertise. Given the volume and complexity of claims and counterclaims, the scope of fact and expert discovery, the number of witnesses and exhibits at trial, and the extensive post-trial briefing, the number of attorneys involved was both reasonable and essential to achieving a successful outcome. *See* Pietragallo Decl. ¶ 84.

### III.   THE REQUESTED EXPENSES ARE REASONABLE.

After multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate, a court adds that figure to the reasonable expenses to arrive at the total award. *Poulter v. Ford Motor Co.*, 1997 WL 22673, at \*2 (E.D. Pa. Jan. 17, 1997) (citing *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Mallet does not seek reimbursement for travel or related expenses incurred by out of-state counsel in connection with appearances in the forum, which are not recoverable under the PUTSA. *See PPG Indust.*, 2022 WL 247755, at \* \*14; Zarlenga Decl. ¶ 73. Mallet has also separately submitted a Bill of Costs covering expenses related to deposition transcripts, certain deposition videos, and trial transcripts. *See* ECF No. 556. Accordingly, Mallet's counsel seeks only the non-fee litigation expenses not previously included in that filing and not related to Mayer Brown's travel to the forum. Mallet seeks $405,646.26 in expenses, which consist of $42,0337.27 incurred by Mayer Brown and $363,612.99 by Jackson Lewis. *See* Zarlenga Decl. ¶ 63; Ex. 4, Presley Decl.

Throughout the litigation, Mayer Brown exercised billing judgment in the expenses it passed through to Mallet. For example, the firm elected not to bill Mallet for legal research charges incurred through Westlaw or LexisNexis. Zarlenga Decl. ¶ 73. The expenses Mallet now seeks to recover fall into four principal categories: (1) PACER research, filing fees, and other court costs, including pro hac vice admissions; (2) document reproduction, including costs for photocopying— both internal and vendor-provided—used in trial preparation; (3) necessary travel expenses incurred in connection with discovery and out-of-state expert depositions, such as airfare, lodging, local transportation, and business meals, all of which were limited to economy-class airfare and excluded travel to the forum; and (4) miscellaneous litigation costs, including courier services and process server fees. *Id.* ¶ 74.

The expenses sought by Jackson Lewis are likewise reasonable. Those expenses include (1) forensic examiners who reviewed Defendants' electronically-stored information and device data; (2) travel related expenses for out-of-state depositions; and (3) document storage and production costs. Presley Decl. ¶ 45; *id.* Ex. 4.

## CONCLUSION

For the foregoing reasons, Mallet respectfully requests that the Court grant Mallet's motion for attorneys' fees and costs in this case in full.

Dated: July 3, 2025                     Respectfully submitted,

                                        */s/ Carmine R. Zarlenga*

                                        Carmine R. Zarlenga (DC Bar No. 386244)
                                        E. Brantley Webb (DC Bar No. 1014561)
                                        Catherine Medvene (DC Bar No. 1616838)
                                        *Admitted Pro Hac Vice*
                                        MAYER BROWN LLP
                                        1999 K Street NW
                                        Washington, DC  20006

(202) 263-3227
czarlenga@mayerbrown.com
bwebb@mayerbrown.com
cmedvene@mayerbrown.com

Cecilia G. Rambarat (NC Bar No. 58047)
*Admitted Pro Hac Vice*
MAYER BROWN LLP
300 South Tryon Street, Suite 1800
Charlotte, NC 28202
(704) 444-3500
crambarat@mayerbrown.com

Whitney Suflas (NY Bar No. 5637830)
*Admitted Pro Hac Vice*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500
wsuflas@mayerbrown.com

Anna V. Durham (TX Bar No. 24120810)
*Admitted Pro Hac Vice*
MAYER BROWN LLP
700 Louisiana Street, Suite 3400
Houston, TX 77002
(713) 238-3000
adurham@mayerbrown.com

Marla N. Presley (PA Bar No. 91020)
Laura C. Bunting (PA Bar No. 307274)
JACKSON LEWIS P.C.
Liberty Center
1001 Liberty Avenue, Suite 1000
Pittsburgh, PA 15222
(412) 232-0404
marla.presley@jacksonlewis.com
laura.bunting@jacksonlewis.com

*Attorneys for Plaintiff Mallet and Company
Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing to be filed on July 3, 2025, via CM/ECF, which system will serve notice of same on all parties registered to receive same via the ECF system.

Ronald L. Hicks, Jr. (PA ID 49520)
Thomas S. Jones (PA ID 73636)
Carolyn B. McGee (PA ID 208815)
Kevin C. Meacham (PA ID 208152)
Cara L. Brack (PA ID 330369)
**NELSON MULLINS RILEY &**
**SCARBOROUGH LLP**
One PPG Place Suite 3200
Pittsburgh, PA 15222
(412) 730-4050 (Telephone)
(412) 567-9241 (Fax)
Ronald.hicks@nelsonmullins.com
Thomas.jones@nelsonmullins.com
Carolyn.mcgee@nelsonmullins.com
Kevin.meacham@nelsonmullins.com
Cara.brack@nelsonmullins.com

Jonah D. Samples (WV ID 13683)*
*admitted pro hac vice*
**NELSON MULLINS RILEY &**
**SCARBOROUGH LLP**
949 3rd Ave, Suite 200
Huntington, WV 25701
304 526-3504 (Telephone)
304 526-3599 (Fax)
Jonah.samples@nelsonmullins.com

*Counsel for Defendants Russell T. Bundy*
*Associates, Inc., d/b/a Bundy Baking*
*Solutions and Synova, LLC*

Ada Lacayo, *pro se*
328 Michigan Avenue
Lower Burrell, PA 15068
(724) 980-7325
Lacayo28@comcast.net


William "Chick" Bowers, *pro se*
965 Club House Boulevard
New Smyrna Beach, Florida 32168
(386) 314-9701
Chica965@yahoo.com

/s/ Carmine R. Zarlenga
Carmine R. Zarlenga