**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MALLET AND COMPANY INC., ) | CASE NO.:  2:19-cv-01409 |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | The Honorable Cathy Bissoon |
| ) | |
| ADA LACAYO, RUSSELL T. BUNDY ) | |
| ASSOCIATES, INC., d/b/a BUNDY ) | |
| BAKING SOLUTIONS, SYNOVA, LLC, ) | |
| and WILLIAM "CHICK" BOWERS, ) | |
| ) | |
| *Defendants*. ) | |
| ) | |
| ) | |

<u>**DECLARATION OF CARMINE R. ZARLENGA IN SUPPORT OF MALLET &
COMPANY INC.'S PETITION FOR ATTORNEYS' FEES**</u>

I, Carmine R. Zarlenga, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am a partner at Mayer Brown, LLP, and an attorney of record for Plaintiff Mallet and Company Inc. ("Mallet") in the above-captioned litigation.

2.     I was admitted to practice before this Court in the above-captioned case, *pro hac vice*, on August 23, 2022. ECF No. 194.

3.     I submit this Declaration in support of Mallet's Motion For An Award of Attorneys' Fees and Costs Under 12 Pa. C.S. § 5305 of the Pennsylvania Uniform Trade Secrets Act ("PUTSA") and 18 U.S.C. § 1836(b)(3)(D) of the Defend Trade Secrets Act ("DTSA").

4.     I have knowledge of the facts set forth herein, and if called to testify as a witness thereto, I could and would competently do so under oath.

## I.     BACKGROUND AND EXPERIENCE

5.     I have been practicing law in private practice since graduating from law school and taking the bar exam in 1984.

6.     I began my career practicing antitrust law at Howrey LLP, almost exclusively in the food and beverage sector.  I became a partner at Howrey on January 1, 1993. I practiced continuously at Howrey until March 15, 2011.  During my time at Howrey, my work expanded to other areas of law including trade secret litigation, unfair and deceptive practices litigation under state laws, contract litigation of numerous sorts, and intellectual property litigation.

7.     I joined Mayer Brown as a partner in March 2011. Mayer Brown is an international law firm consisting of approximately 1,800 lawyers located in the United States, Brazil, Europe and Asia. It has been in business continually for approximately 140 years and is regularly ranked among the world's leading law firms in the Americas, Asia, and Europe by the profession's leading

ranking organizations. Mayer Brown serves many of the world's largest companies, including a significant number of Fortune 500 companies.

8.      I estimate that since becoming a partner at Mayer Brown, I have reviewed, revised, and sent several thousand bills to scores of clients. In so doing, I have consistently exercised billing judgment to ensure each bill reflected the value that the clients received, including eliminating charges for any duplicative work, and removing costs more appropriately considered as "overhead."

9.      Throughout my career at Mayer Brown, I have appeared in over 50 different state and federal courts across the United States on behalf of companies small and large—including some of the largest companies in the world—in a wide variety of complex antitrust, commercial litigation, and intellectual property matters. My litigation experience ranges from smaller, private disputes to large, complex class actions and business disputes with claimed damages in excess of $1 billion. I have handled matters involving antitrust, contract, fraud, business torts, trade secrets, unfair trade practices, intellectual property and false advertising.

10.     Relevant to this case, I have over 40 continuous years of antitrust experience in civil cases involving the food and beverage industry. I also have substantial trade secret litigation experience in the food and beverage industry in excess of 20 years. A copy of my professional profile from Mayer Brown's website is attached as Exhibit 1.  My LinkedIn profile is attached as Exhibit 2.  As reflected therein, I have received numerous honors and awards relating to my professional career.

## II.     MALLET AND VANTAGE'S RETENTION OF MAYER BROWN

11.     Because of my career-long work in antitrust and trade secret litigation in the food and beverage industry, I was contacted by Ms. Alison Butler, then-General Counsel for Vantage

Specialty Chemicals, Inc. ("Vantage") and Corporate Secretary for Mallet and Company Inc. ("Mallet), in June 2022. Ms. Butler was seeking outside counsel to represent Mallet and Vantage in this litigation, in light of the new antitrust counterclaims alleged by Russell T. Bundy Associates, Inc. d/b/a Bundy Baking Solutions ("Bundy") and Synova LLC ("Synova") (together, the "Bundy Defendants") in their Amended Counterclaims. ECF No. 179.

12.     In those Counterclaims, the Bundy Defendants added Vantage as a party to the litigation and, among other things, alleged that Mallet and Vantage violated Section 2 of the Sherman Act by purportedly engaging in below-cost pricing. These federal antitrust counterclaims implicated the entire North American market for Mallet's bakery release agents.

13.     Based on my experience, it is common for clients to be especially wary of alleged antitrust claims because if a party is found liable for an antitrust violation, they could be subject to treble damages, follow-on class action lawsuits, and potential investigation by the Federal Trade Commission, the United States Department of Justice, and/or Attorneys General of various states.

14.      To make the cost of litigation more affordable for Mallet and Vantage, Mayer Brown discounted their hourly attorney rates by 25%. In addition to this discount, and consistent with my normal practices, I exercised billing judgment to ensure that the bills reflected the value that Mallet and Vantage received, including eliminating charges for duplicative work and any costs that I believed more appropriately qualified as "overhead."

## III.     OVERVIEW OF THE LITIGATION

15.     From June 2022 through the present, I have provided legal services and oversight of the main aspects of this case, including fact and expert discovery and related disputes, summary judgment briefing, trial preparation, post-trial motions, strategy, and overall case management.

### A.    Fact Discovery

16.    Fact discovery in this case was expansive. In particular, given the extensive efforts of Ada Lacayo ("Lacayo"), William "Chick" Bowers ("Bowers"), Synova, and Bundy's (together, "Defendants") to conceal their misappropriation of Mallet's trade secret and confidential information, the Court ordered the Defendants to turn over full forensic images of key electronic devices and data sources in the their possession. In particular, during fact discovery in this case, Defendants produced:

(a) Forensic images of all three computers issued by Synova to Lacayo;

(b) Google Drive folders accessible to Synova employees;

(c) USB thumb drives used by Lacayo during her employment with Mallet or Synova;

(d) Forensic image of the Apple iPad issued by Synova to Bowers;

(e) Data from the following email accounts:

    i.    alacayo@synovaoil.com,

    ii.    wbowers@synovaoil.com,

    iii.    rbundy@bundybakingsolutions.com,

    iv.    ada.lacayo@gmail.com,

    v.    ada.lacayo@protonmail.com,

    vi.    cbowers@reagan.com,

    vii.    chickocean@icloud.com, and

    viii.    Holsum1908@gmail.com.

(f) Data from all cloud-based storage accounts and OneNote accounts accessed or used by Bowers or Lacayo since 2017;

(g) Data from on-site network area storage from Synova's offices in Westerville, Ohio, and Bundy's headquarters in Urbana, Ohio used from 2017; and

(h) Forensic images of all personal iPads or cell phones used by Bowers and Lacayo since 2017.

17.    Much of this data was carefully reviewed by Mayer Brown attorneys familiar with the case to identify relevant documents and then organize those documents for use in depositions, motion practice, and trial.  Those efforts required hundreds of hours by Mayer Brown attorneys.

18.    During fact discovery, Mayer Brown took or defended 20 depositions of fact witnesses, including six Fed. R. Civ. P. 30(b)(6) depositions, which all required substantial time and preparation. The deposition testimony of almost all of these fact witnesses was used during summary judgment or at trial, highlighting the importance of these depositions.

19.    Defendants pursued numerous, irrelevant theories during fact discovery in this case. This included requests for voluminous tax records from both Mallet and Vantage (ECF No. 212) as well as Vantage's third-party tax auditors (ECF No. 212) and deposition examination of Jan Tinge, Mallet's corporate representative, on multiple irrelevant tax issues. Subsequently, Defendants asked not one question concerning Mallet or Vantage's taxes at trial.

**B.    Expert Discovery**

20.    Expert discovery in this case was similarly expansive. Mallet initially engaged four experts: (1) Andrew Reisman, an expert in the field of digital forensics and electronic discovery; (2) Dr. Eric Decker, a professor in the food science industry; (3) John Scalf, an economist who evaluated the Bundy Defendants' predatory pricing counterclaim; and (4) Robert McSorley, a damages expert. Mallet served its four initial expert reports on February 21, 2023.

21.     In contrast, the Defendants engaged six experts: (1) Brett Creasy, an expert in the field of digital forensics and electronic discovery; (2) David Oberdick, a patent lawyer who opined on whether Mallet's trade secret formulas were located in the public domain; (3) Douglas King, a damages expert; (4) Dr. Lee Polite, an expert who opined on whether Mallet's trade secret formulas could be reverse engineered; (5) Dr. Luis Rodriguez-Saona, a professor in the food science industry; and (6) Ronald Wilson, who opined on the difficulty in formulating a release agent. Defendants served their initial expert reports on March 23, 2023.

22.     In rebuttal, Mallet engaged two experts to rebut Mr. Oberdick's opinions. In my opinion, it was prudent to employ two different experts—Dr. Floros and Mr. Stoll—to rebut Mr. Oberdick's opinion in light of the caselaw highlighting that a patent must be analyzed from the perspective of a person of ordinary skill in the art. Dr. Floros served as the scientific expert with the necessary background to analyze the patents at issue in Mr. Oberdick's report, while Mr. Stoll, a patent lawyer, applied Dr. Floros' scientific analysis to the legal standard to determine whether Mallet's trade secret formulas were readily ascertainable from the prior art cited by Mr. Oberdick.

23.     Mallet also engaged two experts to rebut Dr. Polite's opinions. Dr. Polite was engaged by the Defendants to opine on whether Mallet's trade secret formulas could be reverse engineered. However, Dr. Polite's was provided—and reviewed—Mallet's trade-secret-protected formulas prior to his gas chromatography analysis. To conduct a true blind analysis, Mallet engaged Eurofins' Dr. Neil Spingarn, who conducted the same gas chromatography analysis as Dr. Polite using the same materials and parameters—except, Dr. Spingarn was never given access to Mallet's formulas. Mallet also engaged Dr. McGorrin to compare Dr. Polite's methodology and results with those of Dr. Spingarn, using Mallet's trade secret formulas.

24.     Depositions of the 14 expert witnesses involved in this case were conducted in May and June of 2023. These depositions required a substantial amount of time and preparation.

### C.     Summary Judgment

25.     About a month before summary judgment, the Bundy Defendants voluntarily dismissed, with prejudice, all antitrust counterclaims against Mallet and Vantage. ECF No. 249.

26.     During the summary judgment phase of this case, the Defendants sought summary judgment on all nine claims that were pending against them. Mallet sought summary judgment on the three remaining counterclaims against them.

27.     In addition to the time spent on legal research and drafting the briefing, statements and counterstatements of fact, for every document, exhibit, and brief filed during summary judgment, Mayer Brown attorneys spent time reviewing every aspect of the filing to ensure that no confidential or trade secret information was filed on the public docket. The same attorneys also spent time reviewing the Defendants' summary judgment filings to ensure that no confidential or trade secret information was filed publicly.

28.     On March 29, 2024, the Court issued its summary judgment order, denying Defendants' motion for summary judgment in its entirety and granting Mallet and Vantage's motion for summary judgment on one counterclaim, but denying their motion as to the other two counterclaims. ECF No. 313.

### D.     Pretrial Motions, Trial, and Post-Trial Motions

29.     Mallet filed seven motions in limine and Daubert motions (including moving to exclude the flawed expert opinions of Ronald Wilson, Brett Creasy, and Dr. Lee Polite). ECF Nos. 371-387. In total, Defendants filed ten motions in limine and Daubert motions, including moving

to exclude the opinions of all of Mallet's experts, save Mallet's antitrust expert, John Scalf, who, instead, Defendants indicated they wished to call at trial. ECF Nos. 344-367, 369-370.

30.     The Court excluded three of Defendants' experts: Defendants' lay witness Mr. Wilson, Dr. Polite, and patent expert Mr. Oberdick. ECF No. 447. As a result, Mallet and Vantage's experts, Dr. McGorrin and Dr. Spingarn, who rebutted the opinions of Dr. Polite were mooted. In addition, Mallet and Vantage's experts, Dr. Floros and Mr. Stoll, who rebutted the opinions of Mr. Oberdick were also mooted.

31.     The jury trial in this case commenced on April 7, 2025 and lasted five days. Mallet and Vantage were represented by the following Mayer Brown attorneys: Carmine Zarlenga, Brantley Webb, Erick Palmer, Catherine Medvene, Whitney Suflas, Anna Durham, and Cecilia Rambarat. Based on my experience, this was a reasonable number of attorneys given the scope of the claims at issue in this case as well as the number of witnesses that were called at trial, in relatively rapid succession (nineteen, with several witnesses called to the stand more than once).

32.     During the five day trial, Mallet and Vantage called Robert Shane Porzio, Robert Bundy, Ada Lacayo, Amanda Tallarico, Michael Savidakis, Dr. Erick Decker, Robert Wilhelm, Ben Topercer, William Hallmark, William Bowers, Andrew Reisman, Jan Tinge, and Robert McSorley as witnesses. The Defendants called Ronald Wilson, Ada Lacayo, Dr. Luiz Rodriguez-Saona, Cathleen Colley, Gilbert Bundy, William Hallmark, and Douglas King.

33.     After Mallet and Vantage rested their case, the Defendants sought judgment as a matter of law on all nine claims pending against them. The Court denied the Defendants' motion for judgment as a matter of law.

34.     In addition, after the Defendants rested their case, Mallet sought judgment as a matter of law on Defendants' two remaining counterclaims. The Court granted Mallet's motion,

finding that the Defendants had failed to introduce evidence that they suffered any damages as a result of the behavior alleged in the tortious interference and unfair competition counterclaims. ECF No. 497.

35.    On April 11, 2025, the jury returned a verdict in favor of Mallet on all counts. The jury awarded Mallet $4,250,009.00 in compensatory damages, and $3,000,001.00 in punitive damages. ECF No. 496. In awarding Mallet punitive damages, the jury specifically, and repeatedly, found that the Defendants' misappropriation of Mallet's trade secrets was willful and malicious.

36.    Since the verdict was entered on April 12, 2025, Mallet has filed a number of post-trial motions including Motion for Permanent Injunction (ECF Nos. 510, 511), Letter for Emergency Relief (ECF No. 516), Motion for Sanctions (ECF Nos. 519, 521), Motion for Prejudgment and Post-judgment Interest (ECF Nos. 542, 543), Bill of Costs (ECF Nos. 555, 556), Responses to Defendants' Rule 50 and 59 motions (ECF Nos. 562, 563, 565, 566), as well was this present Motion for Attorneys' Fees.

### E.    Defendants' Litigation Strategy Increased Costs Substantially

37.    Throughout the past three years, Defendants' litigation strategy in this case can be fairly described as "scorched earth."

38.    Beyond the scope and complexity of the antitrust and trade secret misappropriation issues in this case, a significant portion of Mayer Brown's billed hours, fees, and costs are directly attributable to Defendants' tactics. At multiple junctures, Defendants required Plaintiffs to engage in extensive briefing, motion practice, or discovery on irrelevant issues.

39.    During the course of discovery, Mallet learned that the Defendants went to great efforts to conceal their wrongdoing. For example, Robert Bundy, the Chief Executive Officer tasked with creating Synova, created a pseudonym and alias email address to mask his electronic

communications with Shane Zhou, a former Mallet employee. Instead of using the customary ESI search terms to locate responsive documents, the Court ordered the Defendants to create forensic images of all relevant devices and to produce all relevant data sources in their possession. As a result, Mallet received a large quantity of information from the Defendants that my team had to sift through to locate relevant, responsive documents.

40.    In the Bundy Defendants' Amended Counterclaims, they alleged that: (1) the non-compete covenants of defendants Lacayo and Bowers with Mallet were unenforceable; (2) Mallet and Vantage tortiously interfered with Synova's contractual relations with former Mallet employee Cathleen Colley; (3) Mallet and Vantage engaged in unfair competition by wrongfully inducing former Mallet and Vantage employees to terminate their employment or contractual engagement with Synova; (4) Mallet and Vantage violated the Sherman Act (15 U.S.C. § 2) by engaging in predatory conduct by pricing Mallet's bakery release agent products below market costs; and (5) Mallet and Vantage's predatory and anticompetitive conduct through pricing of Mallet's products below market costs tortiously interfered with Synova's prospective contractual relationships with bakery release agent customers. ECF No. 179.

41.    The antitrust counterclaims that the Bundy Defendants brought against Mallet and Vantage, which Mallet and Vantage expended significant resources to defend against, lacked all merit. Among other things, in fact discovery, in response to Mallet's question, "Does Synova have information about any specific transactions i.e. customer name, product, in which Mallet sold Mallet products to that customer below Mallet's costs?" Synova's corporate representative, William Hallmark testified, "At the time this claim was filed, no. We requested items through discovery…." *See* 11/29/22 W. Hallmark Dep. Tr. at 130:19-131:5 (attached hereto as Exhibit 2). At the same time, Robert Bundy, in his deposition, conceded that Mallet had numerous competitors

10

in the market for release agents. *See* 10/06/22 R. Bundy Dep. Tr. at 289:6-296:7 (attached hereto as Exhibit 3). Subsequently, in expert discovery, Defendants did not retain any expert to rebut Mallet's antitrust economist, John Scalf.

42.     Soon thereafter, Defendants voluntarily dismissed, with prejudice, all antitrust counterclaims against Mallet and Vantage. ECF No. 249. However, this was after Mallet and Vantage had been forced to conduct full fact and expert discovery on those counterclaims.

43.     The Bundy Defendants' declaratory judgment counterclaim was also dismissed during summary judgment. ECF No. 313. And, their two remaining counterclaims were dismissed during trial as a matter of law because the Bundy Defendants failed to even *present* any damages suffered as a result of the behavior alleged in the tortious interference and unfair competition counterclaims. Mallet and Vantage were thus forced to needlessly expend significant fees and costs to defend against all five of these counterclaims—all of which were ultimately dismissed and/or never presented to the jury.

44.     During expert discovery, Mallet and Vantage retained: (1) Mr. Scalf to opine on the Bundy Defendants' predatory pricing counterclaim; (2) Dr. Floros and Mr. Stoll to rebut Mr. Oberdick's testimony regarding whether Mallet's trade secret formulas were present in the public domain; and (3) Dr. Spingarn and Dr. McGorrin to rebut Dr. Polite's testimony regarding whether Mallet's baking release formulas could be reverse engineered.

45.     Because the Bundy Defendants ultimately voluntarily dismissed their antitrust counterclaims shortly after expert discovery, Mr. Scalf's testimony was ultimately irrelevant to the issues surviving in this case at trial.

46.     Furthermore, while the Defendants engaged Mr. Oberdick to opine that Mallet's formulas were in the public domain, during his deposition testimony, Mr. Oberdick conceded that

in spite of his robust prior art search, he was unable to locate Mallet's asserted trade secrets anywhere in the public domain, underscoring the superfluous nature of his report and testimony. 06/16/23 D. Oberdick Dep. Tr. at 80:16-20 ("Q. Okay, would you agree that the precise Mallet formulations weren't found in the prior art your search located? A. To the extent we're defining prior art as the printed publications, I do agree with that.") (attached hereto as Exhibit 3). Ultimately, Mr. Oberdick's opinions were never presented to the jury because they were excluded by the Court. In excluding Mr. Oberdick's testimony, the Court noted:

> Upon first seeing reference to patent lawyers, the undersigned thought—and this is not hyperbole—the filings were made in the wrong case. Had decisions of prioritization been considered, this would have been an obvious place to start . . . Hearing patent expert opinions in a trade secret and ex-employee-misappropriation case invites juror confusion; and finally, reflects counsels' frequent aspersions of 'wasting time.' Fed. R. Evid. 402 (allowing exclusion on these bases). They also do not help a jury.

ECF No. 447 at 8. Mallet and Vantage spent a significant amount of resources defending against Mr. Oberdick's opinions by engaging rebuttal experts, Mr. Stoll and Dr. Floros, but such efforts were ultimately unnecessary in light of Mr. Oberdick's exclusion from trial.

47.    Similarly, the Defendants engaged an expert, Dr. Polite, to opine that Mallet's formulas could be reverse engineered. However, the Court excluded Dr. Polite from trial, noting:

> Defendants' putative expert, Lee Polite, would opine that certain of Mallet's formulas easily may be reverse engineered. Plaintiffs have highlighted a whopper of an objection: **Polite was in possession of the formulas**. Defendants attempt to reassure the Court that the witness's 'knowledge of the formulas did not impact his analysis.' Doc. 397 at internal pg. 8 (citing expert rebuttal report). The Court is uncomforted. If any scenario in which having a "script" is problematic, reverse engineering would be at the top . . . **Polite's opinions are tainted. That he possessed the formulas in his reverse engineering evaluation, is a self-inflicted wound from which Defendants cannot recover**. On this basis alone, Polite is excluded.

*Id.* at 11. Mallet and Vantage spent a significant amount of resources defending against Dr. Polite's opinions by engaging rebuttal experts Dr. Spingarn and Dr. McGorrin, but such efforts were ultimately unnecessary in light of Dr. Polite's exclusion from trial.

48.    Another example of Defendants' bad-faith, scorched earth litigation tactics is their recent attempt to publicly disclose Mallet's trade secret formulas. On April 28, 2025, the Bundy Defendants filed their brief in response to Mallet' Motion for Permanent injunction, which included the exact percent composition for two ingredients in one of Mallet's trade secret formulas. *See* ECF No. 514. Within an hour of the filing, Mallet's counsel, Ms. Webb, informed the Bundy Defendants' counsel, Ms. McGee, that their recent filing publicly disclosed Mallet's trade secrets. ECF No. 516-1. However, the Bundy Defendants' counsel refused to file a corrected brief redacting Mallet's trade secret. *Id.* As a result, Mallet was forced to seek emergency relief from the Court. *Id.* Brazenly, the Bundy Defendants filed a motion to strike Mallet's request for emergency relief. ECF No. 517. Thereafter, Mallet filed a motion for sanctions as a result of the Bundy Defendants' reckless, defiant behavior, and to prevent the Bundy Defendants from disclosing Mallet's trade secrets in the future. ECF No. 518-519. In reviewing the filings related to Mallet's request for sanctions, the Court reprimanded the Bundy Defendants' handling of these matters and warned the Defendants that "the Court will not allow what remains of this case to degenerate into a free-for-all. Norms will be respected, and good faith demanded. Should anyone fall short, the consequences will be significant, and swift." ECF No. 522.

49.    At nearly every turn, Mayer Brown was forced to needlessly expend time, money and resources litigating this case to the furthest extent possible. Defendants' scorched earth tactics, which increased Mallet's incurred attorneys' fees and prolonged the resolution of this case, should not be rewarded.

13

## IV.    STAFFING OF THE CASE

50.    When Mayer Brown was first retained in 2022, I staffed the case with then-junior partner, Brantley Webb, who had experience running large, complex litigation matters in federal court, including contract disputes and trade secret matters; Catherine Medvene, a then-fifth-year litigation associate who specialized in antitrust litigation, and Nicholas Ronaldson, a third-year associate in the intellectual property group.

51.    In 2022, several other junior associates, paralegals, and support staff assisted with fact discovery, including written discovery, e-discovery, depositions, and motions practice, including drafting motions, citation checks, and legal research. In addition, Ms. Allison Folk, a partner and litigator at Jackson Lewis, continued to help Mayer Brown's case team with discovery issues through 2022 and into 2023. After 2022, Mr. Ronaldson moved on to other cases. Likewise, Ms. Folk left Jackson Lewis soon thereafter.

52.    Myself, Ms. Webb and Ms. Medvene, all based in Washington, DC, remained the core case team throughout the duration of the litigation.  Jackson Lewis stayed on as local counsel through trial.

53.    In 2023, as fact discovery closed and the expert discovery phase of this case began, I invited associates Cecilia Rambarat and Andrew Spadafora, and then-associate Elaine Liu, to join the litigation team in light of the large number of experts disclosed in the case, including multiple experts disclosed by the Defendants. I also invited Chicago-based partner Erick Palmer to join the case team. Mr. Palmer and Ms. Rambarat, who are registered Patent Attorneys and part of Mayer Brown's Intellectual Property Group, were initially tasked with engaging and overseeing Plaintiff's rebuttal experts to Defendant's disclosed patent expert. With respect to the other experts, during the expert depositions in this case Ms. Webb was helping to lead another five-week jury trial in the District of Connecticut and Ms. Medvene took a maternity leave. As a result, then-

14

associate Ms. Liu, and associate Mr. Spadafora, who are both litigators, worked directly with me to help complete expert reports and take or defend expert depositions.

54.    In 2023, Ms. Webb, Ms. Liu, Ms. Rambarat, Mr. Spadafora, and I all drafted and prepared Plaintiff's motion for summary judgment and opposition to Defendant's cross-motion for summary judgment. During this phase of litigation, I also added Anna Durham to the team in light of the extensive nature of the summary judgment briefing. Ms. Durham is an experienced litigation associate in Mayer Brown's Houston office. There were other attorneys, support staff, and paralegals who helped, at times, in 2023 with summary judgment briefing, but the core team consisted of the aforementioned Mayer Brown attorneys.

55.    After  summary judgment, with both Ms. Webb and Ms. Medvene working on the case again, Ms. Liu and Mr. Spadafora moved on to other matters.

56.    As trial approached, there were a large number of motions in limine and Daubert motions filed by the Parties (and particularly by Defendants), with very quick turnaround times for responses. In January 2025, I invited one other litigation associate, Whitney Suflas, and appeals & issues counsel, Eric White, to join the team. The core team of attorneys that were most involved in the pretrial phase of the case included: myself, Ms. Webb, Mr. Palmer, Ms. Medvene, Ms. Rambarat, Ms. Suflas, Mr. White, and Ms. Durham.

57.    The core trial team included myself, Ms. Webb, Mr. Palmer, and Ms. Medvene (all of whom conducted examinations at trial), as well as Ms. Suflas, Ms. Rambarat, and Ms. Durham. Our trial team also included Isaak Gonzalez, who served as our technical support staff, and two paralegals, Molly December and Hawah Syeh.

58.    In the post-trial phase of this case, I invited two other attorneys, appellate counsel, Graham White and litigation associate Jennifer Weinberg to the case team since Mr. Palmer left

the firm and Ms. Suflas took a maternity leave. The Mayer Brown attorneys who most actively participated in the post-trial phase of the litigation include myself, Ms. Webb, Mr. Eric White, Mr. Graham White, Ms. Weinberg, Mr. Palmer (until his departure), and Ms. Rambarat.

59.     Based on my experience over the past 40 years, a reasonable number of attorneys were staffed on this case, given the number and scope of the claims and counterclaims at issue, the breadth of fact discovery and expert discovery, the number of witnesses, experts, and exhibits presented at trial, and the voluminous number of post-trial motions filed.

## V.    MALLET'S FEE AND COSTS REQUEST AND METHODOLODY

60.     In total, Mallet is seeking $11,397,874.15 in attorneys' fees, costs, and expenses from the Bundy Defendants.

61.     Mallet is seeking $10,992,227.89 in total attorneys' fees from the Bundy Defendants. Of that total amount, $1,949,606 was billed by Jackson Lewis, the law firm engaged to represent Mallet prior to Mayer Brown, while $9,042,621.89 was billed by Mayer Brown. The Mayer Brown invoices detailing each billing entry for which Mallet seeks reimbursement is attached as Exhibit 5.

62.     Exhibit 6, attached to this Declaration, is a chart that identifies all of the timekeepers for whose work Mallet is seeking reimbursement, the number of hours for which Mallet is seeking reimbursement for each timekeeper, and the dollar value of those hours, for each year in which work was performed by that timekeeper.

63.     Mallet is seeking $405,646.26 in total costs and expenses from the Bundy Defendants. Of that total amount, $363,612.99 was billed by Jackson Lewis, the law firm engaged to represent Mallet prior to the expansion of the case by Defendants' Counterclaims, while $42,033.27 in costs and expenses was billed by Mayer Brown. The Mayer Brown invoices

detailing each of these costs and expenses for which Mallet seeks reimbursement under both the PUTSA and DTSA is attached as Exhibit 7.

64.   The total amount of fees, costs, and expenses sought by Mallet does not include the total fees and costs associated with the preparation of certain post-trial motions as well as this fee petition and its supporting declarations and exhibits, which are reimbursable under the PUTSA and DTSA. In particular, the fees, costs, and expenses incurred by Mayer Brown attorneys in June 2025 have not been included in the fees, costs, and expenses Mallet is now seeking. Mallet will file a supplemental declaration detailing those fees and costs once Mayer Brown's June invoice has been prepared and submitted.

## A.   The Reasonableness of the Fees Incurred by Mayer Brown

65.   The PUTSA and DTSA permit an award of reasonable attorneys' fees to a prevailing party if a trade secret was willfully and maliciously misappropriated. 12 Pa. C.S. § 5305; 18 U.S.C. § 1836(b)(3)(D). Here, the jury repeatedly found that the Defendants' misappropriation of Mallet's trade secrets was willful and malicious. ECF No. 496. Accordingly, and for the reasons further explained in Mallet's brief in support of this Motion, Mallet now seeks to recover the attorney fees it incurred in this litigation.

66.   I have reviewed the time entries made by Mayer Brown attorneys, paralegals, and support staff, which were charged to Mallet and Vantage in this case.

67.   Based on my 40-years of experience as a litigator and trial attorney, the total number of attorneys at Mayer Brown who played significant roles in this case, over the three-year duration in which Mayer Brown represented Mallet and Vantage, was commensurate with the complexity, scope, length, and gravity of the litigation.

68.    Further supporting the reasonableness of the number of attorneys who participated in this case, is the fact that the Defendants utilized a similar number of attorneys at Nelson Mullins. *See* Docket Sheet (listing total of nine attorneys representing the Defendants, Ada Lacayo, and Chick Bowers in this case).

69.    It is also my opinion that the Mayer Brown attorney rates charged to Mallet and Vantage, which included a 25% discount, were reasonable in light of the complexity and breadth of this case.

70.    For the foregoing reasons, I believe both the amount of hours devoted by Mayer Brown for which we seek reimbursement, our attorneys' hourly rates, and our staffing decisions were necessary, reasonable, and efficient.

**B.    The Reasonableness of the Costs and Expenses Incurred by Mayer Brown**

71.    Under 12 Pa. C.S. § 5305 of the PUTSA, in addition to an award of attorneys' fees, a court may award reasonable expenses and costs to the prevailing party in a trade secret case if the misappropriation was willful and malicious. Here, the jury found that the Defendants' misappropriation of Mallet's trade secrets was willful and malicious. ECF No. 496. Accordingly, Mallet now seeks to recover the expenses and costs it incurred in this litigation.

72.    Mallet seeks the costs and expenses that were charged in Mayer Brown's invoices in this case, that are recoverable under the PUTSA, and which it did not separately include in its Bill of Costs (ECF Nos. 555-556).

73.    Mallet is not seeking recovery of certain costs and expenses: (1) Travel and related expenses to the forum state for out-of-state counsel is not recoverable under the PUTSA (*see  PPG Indust. v. Jiangsu Tai Mao Glass Co.*, No. 2:15-cv-00965, 2022 U.S. Dist. LEXIS 15320, at *45 (W.D. Pa. Jan. 27, 2022)); (2) Mallet previously sought costs and expenses for deposition

transcripts, certain deposition videos, and trial transcripts in its Bill of Costs (ECF No. 556); (3) in the exercise of billing judgment throughout the course of this litigation, Mayer Brown elected not to seek reimbursement from Mallet for legal research conducted using Westlaw and LexisNexis. None of these costs and expenses are included here.

74.     The categories of costs and expenses invoiced by Mayer Brown for which Mallet now seeks reimbursement as part of this Fee Petition are:

(a) <u>PACER research, filing fees, and court costs</u>. Expenses in this category include charges incurred by Mayer Brown attorneys and staff for online research and casework using PACER as well as the costs for pro hac vice admission in the Western District of Pennsylvania.

(b) <u>Document reproduction</u>. This category represents charges for photocopying done either internally or by a vendor during the course of this litigation. It includes black and white and color copy document reproduction utilized in preparing trial binders.

(c) <u>Out-of-forum travel, including business meals for Mayer Brown timekeepers</u>. From time to time throughout the course of this litigation, Mayer Brown lawyers, paralegals, and other support staff incurred expenses related to taking and defending depositions. Expenses in this category include airfare, taxi and rideshare charges, parking fees, lodging and meals purchased while traveling for work on this matter. All airfare purchased in connection with this litigation was for economy-class travel. None of the expenses sought in this category relates to travel by Mayer Brown personnel to the forum.

(d) <u>Miscellaneous</u>: This category include courier services and process server costs.

75.    Accordingly, Mallet is seeking only its necessary non-fee costs and expenses that are not included in Mallet's Bill of Costs (ECF No. 556) and that are not related to Mayer Brown's travel to this forum.

76.    The following table summarizes the various costs that Mayer Brown incurred on Plaintiffs' behalf, for which Mallet is seeking reimbursement:

| Description of Cost | Total Cost |
|---|---|
| PACER research, filing fees, and court costs | $470.09 |
| Document delivery/reproduction | $4,281.53 |
| Travel | $22,788.67 |
| Miscellaneous | $14,492.98 |
| **TOTAL** | **$42,033.27** |

77.    A more detailed description of each cost is attached as Exhibit 7.

## VI.    CONCLUSION

78.    Based on the complexity of the claims and counterclaims that were at issue in this case, the breadth of fact and expert discovery, and the scorched-earth litigation strategy and tactics employed by the Defendants, the attorneys' fees, costs, and expenses charged by Mayer Brown were reasonable.

79.    I reserve the right to update, amend, and/or supplement this declaration based upon any new and/or additional facts, evidence, or other documents which may come to my attention or based upon any other information, including other expert reports/declarations, which may be produced.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: July 3, 2025

_____
Carmine R. Zarlenga

20